## STATE V. LEEHMAN.

1. The rule of the Code requiring the alleged errors sought to be reviewed to be specifically designated should be respected by both court and counsel, and ordinarily an assignment alleging error in the admission of any evidence of a character or for a purpose named will be disregarded as too general. This being a case involving a human life, the rule is relaxed, and the record examined.

2. A non-expert witness will be allowed to express his opinion as to the mental condition of a person, after having stated the facts upon which such opinion is based; but to authorize the expression of such opinion the witness must state facts which have some significance upon the question of such mental condition.

3. A witness was asked particularly to state how the defendant acted,—his acts and conduct. He answered: "His acts were insanity, I say." This was neither a statement of facts as to defendant's conduct, nor the expression of an opinion that he was then authorized to make, and it was not error for the trial court to rule it out.

4. Another non-expert witness was asked: "Now, from facts within your personal knowledge that you have related upon the witness stand, what was your opinion as to the sanity or insanity of the defendant, Leehman, at those times?" The court sustained the objection of the state to this question. The witness was then asked: "From facts within your personal knowledge that you have testified to you may state your opinion as to whether the defendant Leehman was rational or irrational at those times?" His answer was: "During the times that I have seen him I have always considered him irrational when excited." These questions were so nearly synonymous that if there was error in disallowing the first, it was cured by allowing the second, particularly when considered in connection with his immediately subsequent testimony on cross-examination, as follows:

5. On his cross examination this witness was asked: "State from what you know of him, and have seen of him, whether he would be apt to know right from wrong?" His answer, taken over the objection of defendant, was: "I think he knows right from wrong."

6. This was proper cross-examination, for the test of responsibility is the capacity to distinguish right from wrong, and, taking the three questions and answers together, there was no error in the ruling of the court that could have prejudiced defendant.

7. Upon redirect examination this witness was asked: "Is it your opinion that an irrational man can always know right from wrong?" The state objected, and there was no error in sustaining the objection. The witness was not an expert from whom an opinion upon such matter was competent, nor was he being cross-examined·

8. The mental insanity which does not destroy the capacity to know right from wrong constitutes no defense to crime.

9. Evidence of the subsequent acts and conduct of a person is often compe-

tent as bearing upon his mental condition at a prior time, but it is not admissible as of course. The inquiry always and necessarily involves not only the question of intervening time, but also the character of the manifestations, and the circumstances under which they are observed. There is no error in excluding evidence of subsequent acts and conduct, which could have no probative force or significance upon the question of mental condition.

10. The question propounded by the state to an expert witness, based upon a proper foundation: "What have you to say as to whether the defendant, Leehman, knows moral good from evil, and right from wrong?" is not objectionable as calling for the opinion of the witness as to the moral insanity of the defendant.

11. Such inquiry is not directed to, nor does it involve the question of, "moral insanity," as defined in those jurisdictions where "moral insanity" is recognized as a defense to crime; and an objection to the question on that ground was properly overruled.

12. The ground of an objection to a question being particularly stated, all other grounds are waived.

13. On appeal a party will not be permitted to change the ground of his objections.

(Syllabus by the Court.    Opinion filed June 19, 1891.)

Error to circuit court, Custer county.

Hon. JOHN W. NOWLIN, Judge.

The plaintiff in error was tried in the circuit court in and for Custer county, under an indictment charging him with murder. He pleaded not guilty, and interposed the defense of insanity. He was convicted and brings error to this court. Affirmed.

The facts are stated in the opinion.

*Charles J. Buell* and *Chauncey L. Wood,* for plaintiff in error.

It was error for the lower court to refuse to allow non-expert witnesses to express their opinion as to whether the defendant was sane or insane after having related the facts upon which their opinion was based. State v. Bryant, 6 S. W. 102; Territory v. Hart, 17 Pac. 718; Parsons v. State, 2 So. 854; Lawson's Expert and Op. Ev. 476; State v. Lewis, 22 Pac. 241. Nor was such error cured by subsequently permitting the same witness to answer the same question substituting the words "rational" and "irrational" for the words "sanity" and "insanity."

The lower court erred in allowing witnesses to express

their opinion as to whether or not the defendant knew right from wrong for the reason that the questions were not confined to any time, place or facts referred to on the examination in chief. It was for the jury to say whether the defendant knew right from wrong.

The court erred in permitting witnesses to express their opinion as to whether or not the defendant knew moral right from wrong. Moral insanity is no defense to crime. Flanjigan v. People, 52 N. Y. 467; Com. v. Rogers, 48 Mass. 500; Desty's Am. Crim. Law. § 25.

The court erred in refusing to admit evidence of the in sanity of the accused subsequent to the commission of the crime charged, and in denying offer of defendant to prove the same condition of mind subsequent to the commission as existed previous to, and at the time, of the commission of the crime charged. 2 Greenleaf Ev. § 371; State v. Hays, 22 La. Ann. 39. Dickinson v. Barber, 9 Mass. 225; Beaver v. McDonnell, 10 Exch. 184; Grant v. Thompson, 4 Conn. 203; Bryant v. Jackson, 6 Humph. 99; McLean v. State, 10 Ala. 672; McAllister v. State, 17 Id. 434; Shailer v. Bumstead, 96 Mass. 112; People v. Farrell, 31 Cal. 576; *In re* Toomes, 54 Cal. 509.

In criminal cases every error is presumed to be prejudicial and injurious to the prisoner. His trial must proceed on legal principles, and strictly so. People v. Williams, 18 Cal. 187; People v. Benson, 52 Cal. 382; People. v. Devine, 44 Cal. 460.

*Robert, Dollard, Attorney General*, for defendant in error.

While it is true the court below refused to permit a witness to testify as to his opinion of whether or not the accused was sane or insane, still the witness was permitted to testify whether from the facts within his personal knowledge as testified to, the defendant was rational or irrational. The words rational or irrational are much broader in their meaning than sane or insane, and instead of being prejudiced by this ruling the defendant was allowed a more liberal examination of the witness.

Opinion so far as it consists of a statement of an effect produced upon the mind becomes primary evidence and hence ad-

missible whenever a condition of things is such that it cannot be reproduced and made palpable to the jury. Whart. Crim. Ev. § 459, 460. People v. Sanford, 43 Cal. 29.

Insanity is no defense unless it incapacitates to distinguish between right and wrong. § 6215 Comp. Laws; 2 Greenleaf Ev. § 373; Loeffner v. State, 10 O. St. 598; Fisher v. People, 31 Ill. 385; State v. Lewis, 22 Pac. 241; State v. Scott, 41 Minn. 365; 1 Whart. and Still. Med. Jur. §§ 116, 124; 1 Whart. Crim. Law, §§ 34, 36; People v. Kemler, 24 N. E. 9. Questions to a witness as to the capacity of a defendant in a homicide case, to understand the difference between right and wrong, are not objectionable. Giebel v. State, 12 S. W. 591.

The court did not err in excluding testimony as to alleged insane acts subsequent to the homicide. Commonwealth v. Pomeroy, 117 Mass. 143.

KELLAM, P. J. The plaintiff in error was indicted and tried in the circuit court in and for Custer county for the crime of murder, in shooting and killing one James H. Burnes on the 11th day of July, 1889. He pleaded not guilty, and interposed the defense of insanity. He was convicted, and by writ of error brings the record of the trial to this court for review. The errors assigned are based upon the rulings of the trial court in admitting and excluding evidence. The first five assignments are general, and allege error in admitting or rejecting any evidence of a designated character, without in any manner specifying in whose testimony, or in what part of the record, the alleged error occurs. Such an assignment, if recognized as sufficient, would impose upon this court the duty of carefully examining the entire record in a search for errors of the nature complained of, and this it was the evident design of the statute to provide against. The rule of the Code requiring the errors sought to be reviewed to be specifically pointed out, should be respected by both court and counsel. The issue in this case involves a human life, and as no question is raised by the state as to the sufficiency of the assignment, we feel constrained to relax the rule, so far as it is intended for the relief of the court, and examine the records fully.

The evidence for the state shows that the next day after the killing the defendant took flight, went to Fall River county, S. D.,—about 35 miles distant from the scene of the killing,— hired out as a farm hand, and worked for a period of three weeks. On being discharged he went to Ft. Robinson, Wyo. T.,—about ninety miles distant,—worked making hay for a short time; then went to Chadron, Neb.,—about 90 miles from the scene of the killing,—to attend a soldiers' reunion; returned again to Ft. Robinson, and then went to Rushville, Sheridan county, State of Nebraska, where he hired out on a farm, and was there captured about the 1st day of September, 1889, and returned to Custer county. Among other witnesses called by the state was Albert S. Lindsey, who, being first duly sworn, testified as follows: "I reside in Fall River county, South Dokota, and have lived there, on and off, for about five years on a ranch. I first met the defendant, John B. Leehman, in July, 1889. He came to my ranch, and wanted work. He told me his name was George Benjamin Lawrence. I hired him, and he worked for me three weeks and two days, or two weeks and two days,—somewhere near that time." Cross-examination. The witness further testified: "I discharged him. He did not attend to his duties just as I thought he should, and I was a little uneasy about him being there, and I considered that I had better not keep him any longer. Question 6. What was the matter with him? Answer. I took him to be a man of insanity. (The answer is stricken out by the court, to which ruling defendant excepts.) Q. 7. That is the reason you dispensed with him? A. Yes, sir. Q. 8. State how he acted while he was there, his acts and conduct. A. His acts were insanity, I say. I took him the first night he arrived at my place to be insane, and I didn't want him there. (The testimony is ordered stricken out of the record by the court, to which ruling defendant excepts.) A. I think he asked me my opinion of the man's character. By the Court: In stating your testimony, state what the man did. We do not want your opinion. You may give acts, and facts and circumstances. That is what you are to relate. The jury will say

what the effect of it was. A. I don't know what way I could answer. Q. 9. Was there anything peculiar about his actions? Anything of that kind you may relate, but not your opinion of what he did. By the Court: State what you saw. If you saw anything peculiar, state what you saw. A. He acted very peculiar, and would talk very queer. There are times when he would start a conversation, and jump right off onto another, and it didn't really amount to anything. You could not hardly tell by following his conversation what he was talking about. It would be first one thing and then another. Q. 1. By the Court: He was a little incoherent in conversation, and could not carry on a conversation intelligently? A. That is what I mean. Q. 2. Do you recall another circumstance that you think was peculiar? He wore his clothes like he did when he came there, did he? A. He didn't wear the clothes he did when he came there. Q. 3. He changed his clothes? A. He didn't have scarcely any clothes when he came there. Q. 4. He got other clothes, did he? A. Yes, sir. Q. 5. Was there anything peculiar in that? A. I don't know as there was. Q. 6. The peculiarity you noticed most was his conversation, was it? A. Yes, sir. Q. 7. And that seems about the only peculiarity you noticed? A. Yes, sir."

In his argument the counsel for the plaintiff in error, referring, we suppose, to the testimony of this witness, says the court erred in refusing to allow non-expert witnesses to express their opinion as to whether the defendant was sane or insane, after having related the facts upon which their opinion was based. If the question presented and the ruling of the court were as indicated by counsel's brief, it would probably be held to be error, for it seems to be now well settled in nearly all the states that a non-expert witness will be allowed to express his opinion as to the mental condition of a person after having stated the facts upon which such opinion is based. People v. Conroy, 97 N. Y. 62; State v. Pennyman, 68 Iowa, 216, 26 N. W. Rep. 82; Territory v. Hart, (Mont.) 17 Pac. Rep. 718; Webb v. State, 5 Tex. App. 608; Hardy v. Merrill, 56 N. H. 227; State v. Klinger, 46 Mo. 228. The witness Lindsay

had testified that defendant had worked for him two or three weeks, commencing in July, 1889, which would be soon after the alleged homicide; that he discharged him; that he did not attend to his duties as witness thought he should; that he was a little uneasy about having him there, and considered that he had not better keep him any longer. He was then asked, "What was the matter with him?" and answered, "I took him to be a man of insanity." This answer was stricken out by the court, to which defendant excepted. The reason for allowing a non-expert witness to state the impression made upon him by certain facts and conduct is the impossibility of reproducing before the jury the facts and conduct as they were really enacted. If a witness could faithfully and exactly repeat to a jury just what he saw and heard, so that it would appear to them altogether as it did to him, there would be no reason for taking his opinion, for the jury would be as well prepared to draw conclusions as the witness; but where, as in questions of insanity, an opinion must be based upon peculiarities of conduct, of speech, of looks, and other exhibitions, many of which are quite indescribable, a witness is allowed to help out his inability to reproduce these causes to the jury, by stating what impression they made upon him, the jury finally judging of the intelligence and candor and value of the opinion by the matter by which and the manner in which it was testified; but in the case before us the witness had disclosed no fact bearing upon the mental condition of defendant. That in the judgment of witness defendant did not attend to his duties to his satisfaction does not of itself afford the slightest evidence of sanity or insanity. We are not told whether he failed to perform his duties totally or partially, or whether there was some suggestive peculiarity in the manner in which he discharged them. To accept his opinion predicated upon that meaningless fact would be equivalent to taking his abstract unsupported opinion as to defendant's insanity. We think there was no error in striking out the answer. The witness was then asked particularly to "state how he acted while he was there—his

acts and conduct,"—and his answer was: "His acts were in-. sanity, I say. I took him the first night he arrived at my place to be insane, and I didn't want him there." If this answer had been designedly artful it could not have more completely avoided an intelligent response to the call of the question for facts as to the conduct of defendant. "His acts were insanity." This was not a statement, nor an attempt at a statement of his acts or conduct, but the expression of the witness' opinion as to acts which he did not disclose. It was properly stricken out. This witness afterward testified that the defendant was incoherent in his conversation, and that he had scarcely any clothes when he came there. Whether or not these two facts being testified to would have justified the court in taking the witness' opinion as to defendant's insanity, we do not stop to consider, for his opinion was not thereafter asked for. So far as an opinion was expressed in his former answer, "I took him to be a man of insanity," it had been properly stricken out, because the witness had then given no evidence which would authorize him to express an opinion. His subsequently giving such evidence, if he did, would not have the effect to restore to the record his expunged answer. We do not think defendant can complain of any ruling of the court in connection with the witness Lindsay.

J. G. Barnes, being called as a witness for the defendant, testified that he had known the defendant about five years; that defendant got angry upon very slight provocation, and when angry would deal in the wildest absurdities; that he made gestures with his hands, and spoke in a short, jerky manner; and that his appearance was slouchy. He was then asked the question: "Now, from facts within your personal knowledge, that you have related upon the witness stand, what was your opinion as to the sanity or insanity of the defendant, John B. Leehman, at those times?" To this question the state objected as incompetent. The objection was sustained, and defendant excepted. If the testimony of this witness stopped here, a different question would be presented than is presented by the entire record. Insanity is not a legal term. In law books and

in judicial opinions it is used in its popular sense, and signifies
an unsoundness of mind—a derangement of the intellect. It
may be complete or partial. Insanity is not always and neces-
sarily a defense to a charge of crime. Whether it excuses
from responsibility or absolves from guilt depends upon its de-
gree. U. S. v. Faulkner, 35 Fed. Rep. 730; State v. Nixon,
(Kan.) 4 Pac. Rep. 159; State v. Pagels, 92 Mo. 315, 4 S. W.
Rep. 931; Leache v. State, (Tex.) 3 S. W. Rep. 544. In most
of the states the test is whether a man has sufficient capacity
and reason to enable him to distinguish between right and
wrong; whether he is conscious that the act he is doing, or is
about to do, is a wrong and forbidden act, and one that he
ought not to do. In a very few of the states, where "moral in-
sanity" is recognized as a defense, it is held to excuse responsi-
bility for crime if the person charged, although perceiving the
moral character of the act, had not the capacity of resistance,
as where there was an entire destruction of the freedom of the
will; but this distinction is not important in connection with
the particular question now being considered. With these ob-
servations as to the test and degree of mental insanity which
will excuse, let us look further at the testimony of this witness,
and see if the defendant could possibly have been prejudiced
by the ruling of the court. The next question to this witness
was: "From facts within your personal knowledge, that you
have testified to, you may state your opinion as to whether de-
fendant, Leehman, was rational or irrational at those times."
His answer was: "During the times that I have seen him I
have always considered him irrational when excited." We are
unable to apprehend the distinction between these two ques-
tions which the learned counsel for plaintiff in error seeks to
maintain. It is true that "sanity" and "insanity" are terms
more frequently found in the books than "rational" and "irra-
tional," but we suspect that it is more the result of habit and
convenience than because of any inherent or substantial differ-
ence in their meaning. Webster gives "rational" and "irra-
tional" as synonyms for "sane" and "insane." In People v.
Conroy, 97 N. Y. 62, defendant was convicted in the trial court

of the crime of murder. One of the defenses was insanity. On the trial a witness, having testified to a conversation with the defendant shortly before the homicide occurred, was asked: "Were his acts at eight o'clock that night, in your judgment, rational or irrational?" The question, being objected to by the state, was disallowed by the trial court, and such ruling was held to be reversible error; the appellate court saying: "The evidence called for by this question was pertinent upon the issue of defendant's insanity, and the witness was competent as to the character of the conduct and conversation which he had observed." Possibly it may be true that the adjectives "rational and "irrational" are more often applied to the acts of a person, as in the above case, than to the person, as in the case at bar, but when both are applied to the person, as in the two quoted questions in this case which we are considering, we think they mean the same thing; and that, when the witness testified in answer to the second question, that he considered defendant "irrational when excited," he meant, and the jury understood him to mean, precisely the same as though in reply to the first question he had answered he considered him "insane when excited." Upon cross-examination the witness was asked as follows: "State from what you know of him and have seen of him, whether he would be apt to know right from wrong?" The defendant objected on two grounds: (1) As not being proper cross-examination, and (2) that it was for the jury to say whether he knew right from wrong. The objection was properly overruled. The witness had testified that in his opinion defendant was at certain times and under certain circumstances "irrational." The object of the direct testimony was to show that defendant was not responsible for his acts, but that, as we have already seen, would depend upon the degree or extent of his irrationality. The excusing degree would be incapacity to distinguish right from wrong, and so the witness was very properly asked in cross-examination, if in his opinion, the irrationality that he had testified to was of such character or extent as to incapacitate the defendant from knowing right from wrong. To have disal-

lowed this question would have been to disallow the only test by which it could be determined whether the evidence was of any value or not; for, although at times or in a degree irrational or insane, in the opinion of the witness the important question was, what was his capacity for knowing "the wrongfulness" of the act charged against him? As in the cases cited *supra*, this is the test of responsibility adopted by our Criminal Code, (Section 6215, Comp. Laws.) The witness answered, "I think he knows right from wrong." Taking these several questions and answers together, we perceive no error in the rulings of the court in respect to them which could have prejudiced the defendant. Upon the redirect examination of this witness he was asked this question: "Is it your opinion that an irrational man can always know right from wrong?" The state objected that it was incompetent, and the objection was sustained. This was not cross-examination, calculated to probe the intelligence or the candor of his opinion already expressed, but the direct evidence of a witness called by defendant. He was not an expert. The object of evidence is to assist the jury in the correct and intelligent determination of the questions before them. The answer of this witness to this question, whether in the affirmative or negative, could not help the jury. Their opinion upon the abstract proposition covered by the question would have been as good as that of the witness. Whatever he might be able to tell them about that particular case would be of interest and helpful to them, but his opinion as a layman upon an abstruse question in mental philosophy was clearly incompetent, and properly excluded. It is, however, suggested in argument that the excluded evidence would be competent as tending to explain the inconsistency of the two opinions that defendant was at times irrational, and that he still knew right from wrong; but the two answers were not inconsistent but entirely consistent with each other, and needed no explanation to make them both intelligible to the jury. As we have before seen, the mental insanity which does not destroy the capacity to distinguish between right and wrong constitutes no defense.

The witness Lindsay was then recalled, and testified that he first saw the defendant on the night of July 13, 1889,— which would be two days after the homicide. It will be remembered that this witness had already testified to the acts, conduct, and peculiarities of defendant, from which, as appears by his answer, which was stricken out by the court, he "took him to be a man of insanity." He was then asked: "Did you ever see anything strange in his conduct, conversation, or demeanor? If so, you may state what. Answer. Yes, sir, quite." By the court. That is, after the homicide? A. Yes, sir." Counsel for state objected to the testimony, and the objection was sustained. Defendant's counsel then offered to show by this witness "that the same condition of mind existed since the commission of the crime that did exist before the commission of the crime, and at the commission of the crime charged; and we desire to introduce witnesses for that purpose." The offer was overruled. That evidence of the subsequent acts and conduct of a person is often competent as bearing upon his mental condition at a prior time, is too reasonable and well established to be questioned, but it is not always competent. In Com. v. Pomeroy, 117 Mass. 143, this question was discussed at length. The court said: "Upon the question of sanity at the time of committing an offense the acts, conduct, and habits of the prisoner at a subsequent time may be competent as evidence in his favor. But they are not admissible as of course. When admissible at all it is upon the ground, either that they are so connected with or correspond to evidence of disordered or weakened mental condition preceding the time of the offense as to strengthen the inference of continuance, and carry it by the time to which the inquiry relates, and thus to establish its existence at that time; or else that they are of such a character as of themselves to indicate unsoundness to such a degree, or of so permanent a nature, as to have required a longer period than the interval for its production or development. * * * It is for the court or judge presiding at the trial to determine, in the first instance, whether the facts offered to be proved would, if established, fairly jus-

tify any inference relating back to the time of the alleged offense. This inquiry always and necessarily involves not only the question of intervening time and occurrences, but also the character of the manifestations and the circumstances under which they were observed." There is no reason for believing, and it cannot be presumed that this witness would have testified differently upon this same subject-matter, towit, the conduct and appearance of defendant, than he had already. Its repetition could not have changed the state or force of the evidence. The acts of defendant so testified to were very plainly, "of no special significance as indicating mental disease." They would have had no appreciable probative force if located at a time immediately preceding the homicide. The claim of error would be more meritorious if the rejected evidence would have tended, even moderately, to show a subsequent insanity; but it did not, and so the offer to show that the mental condition of the defendant was the same at the time of the commission of the crime as it was shown to be since, was not and did not involve an. offer to show any other than a normal and rational mental condition. If defendant had been allowed to prove and had proved all his offer covered, it would not and could not have helped his defense of insanity. There was, then, no error in rejecting the testimony and the offer.

On the part of the state, in rebuttal, Dr. John Long was examined as a witness. After testifying that he had "heard all the evidence in this case upon the question of insanity," he was asked this question: "Now, from what you have heard detailed by the witnesses, what have you to say as to whether the defendant, John B. Leehman, knows moral good from evil, and right from wrong?" To this question defendant objected, 'so far as it relates to knowing moral good from evil, as moral insanity is no defense to crime." The objection was overruled, and the ruling excepted to. The witness answered, "Yes, sir; he would." We cannot help regarding both the question and the objection to it as unfortunately phrased. Whatever may be the merits of the discussion as to whether moral insanity should or should not be recognized as a defense from

crime, we do not think the question calls for an opinion as to the moral insanity of the defendant. The question is specifically directed to the capacity of the defendant to know or distinguish "moral good from evil, and right from wrong." In his Dictionary of Law, (page 550,) Anderson says: "Moral insanity describes a mind which, while undisturbed by hallucination or delusion, and qualified to judge between right and wrong, is yet powerless to control conduct according to knowledge; as in kleptomania." In the very limited number of states where moral insanity is recognized as a defense the term is applied to and means the condition of incapacity to resist an impelling inclination, although there is present the consciousness that the act to be committed is wrong; in other words, the incapacity of self control, so that there is no longer freedom of the will. This condition is illustrated by GIBSON, C. J., in Conn. v. Mosler, 4 Pa. St. 267: "But there is a moral insanity  *  *  * consisting of an irrisistible inclination to kill, or to commit some other particular offense. There may be an unseen ligament pressing on the mind, drawing it to consequences which it sees, but cannot avoid, and placing it under a coercion which, while its results are clearly perceived, is incapable of resistance." See, also, Spencer v. State, (Md.) 13 Atl. Rep. 814; Leach v. State, (Tex.) 3 S. W. Rep. 539. It is very evident that the qestion objected to did not relate to, nor call for the opinion of, the witness as to the moral insanity of defendant. What, then, was the effect of the objection? The ground of the objection was specifically stated, and was that moral insanity was no defense to crime. The objection was not relevant to the question. The objection was not to the witness expressing an opinion as to the mental insanity of defendant, which the question distinctly called for, but to the expression of opinion as to his moral insanity, which the question did not call for. The objection was misdirected, and must fail. The ground of the objection having been particularly stated, all other grounds were waived. People v. Manning, 48 Cal. 335; Floyd v. State, (Ala.) 2 South. Rep. 683; Larrison v. Payne, 5 N. Y. Supp. 221; Brackett v. Nikirk, 20 Ill. App. 525; Cox v.

Cody, 75 Ga. 175.   Nor will a party on appeal be permitted to change the ground of his objection.   Tooley v. Bacon, 70 N. Y. 34;  People v. McCauley, 45 Cal. 146.   This discussion covers all the exceptions appearing on the record.   We find no error, and the judgment of the court below must be affirmed. The cause is remanded, with directions to carry the judgment into effect according to law.   All the judges concurring.