STATE, Respondent v. AUSTIN, Appellant

(172 N.W.2d 284)

(File No. 10472.   Opinion filed November 19, 1969)

**Joseph H. Bottum,** Rapid City, for defendant.

**Gordon Mydland,** Atty. Gen., **Walter W. Andre**, Asst. Atty. Gen., Pierre, for plaintiff.

RENTTO, Judge.

The defendant's 2 1/2 year-old-son, William L. Doty, died on October 8, 1966. She and her companion, Ronnie O. Goode, were separately charged with manslaughter in the first degree arising therefrom. They were also separately tried. She first pleaded only not guilty, but later supplemented it by pleading not guilty by reason of insanity. Under SDCL 1967 23-37-1 the latter plea is now entered by pleading not guilty by reason of mental illness. The jury returned a verdict finding her guilty as charged. She appeals from the judgment sentencing her to life imprisonment.

The physician who first saw the child when it was brought to the hospital about 7:30 p. m. on October 6th stated that it was unconscious and breathing spontaneously but irregularly. He observed that there were numerous bruises on the body. They were spread all over but concentrated on the back from the head to the knees. The stages of discoloration indicated they had been inflicted at different times. He died about 5 a. m. on October 8th. The pathologist who performed the autopsy stated that the probable cause of death was a subdural hematoma sustained by back and forth motion of the head during an act of shaking.

The information filed against her charged that the homicide was perpetrated without a design to effect death but while she was engaged in the commission of a misdemeanor involving moral turpitude, to wit: child abuse. This misdemeanor is defined in SDCL 1967 26-10-1 as follows:

> "It shall be unlawful for any person willfully, negligently, or unnecessarily to expose, torture, torment, cruelly punish, or willfully neglect any child under fourteen years of age or deprive such child of necessary food, clothing, shelter, or medical attendance."

Goode, who had been spending the day with her and her son, was similarly charged.

As grounds for reversing the judgment of conviction she urges that the court committed prejudicial error: (1) in not granting her motion for a change of venue; (2) in admitting into evidence pictures of the child's body taken shortly after his death; (3) in charging the jury that it could find the defendant guilty if she aided and abetted another person in causing the death of her son; and (4) in sentencing her to life imprisonment.

While these parties were charged separately one lawyer was appointed to represent both of them as indigents. The lawyer so appointed is not the one who appears for her on this appeal, also by appointment. Pursuant to stipulation their preliminary hearings were combined. At the conclusion of this she was bound over to the circuit court to answer the charge of manslaughter in the first degree. Apparently she was then admitted to bail and remained at liberty until sentenced. After her trial had been in progress for three days, on motion of her counsel, the jury was discharged so that she could supplement her plea as indicated. This mistrial occurred on February 1, 1967.

Her retrial was commenced on February 20, 1967 with a new and different panel of jurors. At that time she requested that the place of trial be moved from Pennington County. This was based on her claim that she could not have a fair and impar-

tial trial there because of news stories carried by the Rapid City Journal, the only daily paper published in the community. The trial judge indicated that he had some familiarity with these news items and did not feel that they were colored or false. He denied her motion, but indicated he would reconsider it if difficulty were encountered securing an unbiased jury.

The first two of these news items mentioned that charges had been filed against her and Goode in the death of her son and the bonds had been fixed in the sum of $5,000. The next story reported the fact that they had been held for trial after their preliminary hearings with brief mention of the testimony of the state's witnesses, including the acknowledgment by the pediatrician witness that the bruised condition of the body of the Doty child illustrated the "battered child syndrome", and very briefly summarized his description of them. When her trial started the first published article stated that the selection of a jury had begun; that Goode was to be tried later; and reported the above mentioned statement of the pediatrician witness made at the preliminary hearing. During the course of the trial the newspaper carried daily stories consisting of condensations of the testimony of the witnesses without comment or embellishment, and reported that it had been declared a mistrial and the reason therefor.

The day before the retrial began the newspaper reported that it was to be commenced the following day and mentioned that defendant had been examined by psychiatrists. Apparently the paper carried daily factual reports of the second trial. These could have no bearing on the motion under consideration because they were subsequent to the selection of the jury.

■■ The change of the place of trial of criminal actions prosecuted in circuit court by indictment or information is provided for in SDCL 1967 23-28-7. It may be granted whenever it shall appear to the satisfaction of the court by affidavits or other evidence, that a fair and impartial trial cannot be had in such county. The burden of establishing this is on the applicant. 22 C.J.S. Criminal Law § 209. Whether a change of venue

410

is granted or refused is committed to the sound discretion of the trial court; State v. Meservey, 53 S.D. 60, 220 N.W. 139; State v. Belt, 79 S.D. 324, 111 N.W.2d 588; and its order may not be disturbed on appeal unless such discretion has been abused.

■ The pretrial publicity here complained of was factual reporting. It contained no expressions as to the guilt or innocence of the defendant, or other comments on the case or the parties involved. The news articles were not out of the ordinary in such cases—in fact their tone and content were unusually restrained. The facts reported concerning the crime were only those that had been admitted into evidence at the preliminary hearing or at the first trial. There is no claim that they were inaccurate or in any manner misleading or unfair. They placed before the jurors who chanced to read them only matters that they were to hear in court from the lips of witnesses and these only in brief factual condensation. On this record we are compelled to the conclusion that the trial court did not abuse its discretion in denying the application. Manifestly, the pretrial publicity here involved is a far cry from the news media "Roman holiday" condemned in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, and that disapproved in Walker v. People, Colo., 458 P.2d 238, cited and relied on by the defendant.

In securing the trial jury, including one alternate, it appears that only 35 prospective jurors were examined. The defendant challenged nine of these for cause, all of whom were excused without any resistance being made to the challenges. The defendant under SDCL 1967 23-43-28 was entitled to 20 peremptory challenges, but exercised only 10 of them. These observations significantly support the conclusion that the publicity complained of did not deprive the defendant of a fair and impartial trial.

About five hours after the child's death and before the autopsy was performed, five colored pictures of his body were taken in the mortuary by a member of the sheriff's office. The prints of these were 3 1/2" x 3 1/2". Enlargements of them measuring 8" x 10", marked state's exhibits one through five, inclu-

sive, were received in evidence over objection of the defendant. The originals as state's exhibits 1A through 5A, inclusive, were likewise received in evidence. Defendant complains that these exhibits were such as to arouse the sympathies and the prejudices of the jury and should not have been received in evidence. It is not claimed that they do not accurately represent the facts appearing therein, or that the enlargements in any manner distort them.

■■ In a case involving child abuse of the kind here claimed the physical appearance of the body of the victim is important in determining whether the offense has or has not been committed. While there was oral testimony, medical as well as lay, describing the injuries on the body these pictures convey the condition to the jurors with greater accuracy. They serve to make more meaningful the verbal descriptions given by the witnesses of the same condition. State v. Zobel, 81 S.D. 260, 134 N.W.2d 101, cert. den. 382 U.S. 833, 86 S.Ct. 74, 15 L.Ed.2d 76. This does not make them inadmissible. Their admissibility was in the sound discretion of the court. It was for him to say whether their probative value outweighs their possible prejudicial effect. In admitting them we think he ruled correctly.

The court's charge, after specifying the essentials of the crime, informed the jury that the defendant could be found guilty if the killing of her son was perpetrated by her or if she aided and abetted another person in its commission. SDCL 1967 22-3-3. In this regard the jury was instructed as follows:

> "In the case of a parent, the parent has a duty to protect her child. Because of this, if a parent knows that another person is abusing her child or is inclined to do so and such parent stands passively by and does nothing to protect her child or to prevent another from abusing her child, it being reasonably within her power to do so, such parent is considered as having aided and abetted such other person and thereby becomes a party to such abuse of her child and equally guilty. If, under such circumstances, the child dies as a result of such

> abuse by another person, the parent is held to be equally
> responsible for the death of the child."

The state apparently does not claim that the conduct of the mother directly caused the death of her son. Its position seems to be that as to the child's death she was an aider and abetter. In answer the defendant asserts that on the evidence in this record the jury could not properly conclude that the defendant aided or abetted another person in the killing of her son.

The defendant is a 31-year-old white woman. On September 5, 1966, she and her son moved into a unit of the Rosebud Motel in Rapid City, South Dakota, where she was employed as a cleaning maid. Her son at that time appeared to be a well nourished, clean youngster without any body blemishes. These began to appear shortly thereafter and became more numerous and noticeable until the time of his death when they literally covered his body. She was then separated from her fifth husband, James Austin, a 24-year-old black construction worker. Her fourth husband, Robert Doty, a white man was the father of her son William.

Shortly after she moved into the motel unit and until the time of the death of her son, Goode, a 20-year-old black airforce policeman, was a steady visitor in her apartment spending his entire weekends there. When he was there while the defendant was working he stayed with the child and on countless occasions corporally punished him. Neighbors testified that during the weekends they did not see the child, and when Goode left the child seemed to be "bruised up". Her employer urged her to not continue this arrangement telling her that his handling of her son was treatment one would not permit if done to a dog or cat. Her stepfather urged her to discontinue her association with Goode.

In caring for the child, Goode, with the knowledge and consent of the defendant, assisted in toilet training him. This apparently led to Goode "fighting with the boy" as defendant referred to it. She justified it with the claim that he would soon

be the boy's father. On occasions Goode in the presence of the defendant physically punished the child very severely. She did the same herself, on one occasion whipping him with the rabbit-ear antenna from a TV set. It is apparent that she had little patience with him, becoming suddenly very angry when he misbehaved.

Concerning the mistreatment to which the child was subjected, on the evening of October 6th just before it was taken to the hospital, the welfare worker testified as follows:

> "Mrs. Austin called me that morning and said that her baby was in the hospital and was going to die, and I asked her what was the matter, and she said that she had gotten angry at the child the night before and had spanked him until he was black and blue on the bottom, and that her boyfriend had picked him and shook him, and that the baby went into convulsions."

These acts were occasioned by the child's failure to heed their "toilet training" efforts. It is not claimed that on this occasion, or ever, she did anything to prevent Goode from physically disciplining the child in the manner he had, or to protect the child therefrom. Nor is there any showing that it was not reasonably within her power to do so. On the contrary there was credible evidence from which the jury could reasonably find that she consented to and encouraged it.

■ ■ The legal principles that govern in this situation were discussed and applied by us in the Zobel case. We there placed strong reliance on Mobley v. State, 227 Ind. 335, 85 N.E.2d 489, a leading decision in cases of this nature and quoted therefrom the following:

> " 'These were not isolated occurrences, but happened repeatedly and came to be a part of a more or less established course of conduct, to which Mrs. Mobley by her presence, and failure to stop it, became a party. * * * " 'Even if the jury had not believed that violence by the

mother caused or helped to cause the child's death, it reasonably could have found that she aided and abetted Fagan in causing it. * * * the trier of the facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that he assented to the commission of the crime, lent his countenance and approval thereto and thereby aided and abetted it. * * * This, it seems to us, is particularly true when the person who fails to interfere owes a duty to protect as a parent owes to a child.' "

This we think especially fitting here. As pointed out in our decision in the Zobel case, the degree or extent of punishment of the child necessary to hold a parent criminally responsible in situations of this kind, must be left to a great extent in each case to the common sense of the jury. The evidence here was sufficient to submit that question to the jury.

On this record it could rationally find that the defendant aided and abetted Goode in cruelly punishing her son. She was present on many of these repeated occasions, made no protest, and with knowledge of the pattern of conduct looked on with apparent approval. She enlisted his disciplinary efforts in toilet training her son which occasioned much of his punishment. She repeatedly left her son alone with Goode, knowing that he had previously under similar circumstances cruelly punished him.

■ The defendant challenges her life sentence as excessive punishment. SDCL 1967 22-16-19 provides that one guilty of manslaughter in the first degree is punishable by imprisonment in the state penitentiary for not less than four years. Since her sentence is permissible under this statute we may not disturb it, even if we were to regard it as excessive. State v. Johnson, 81 S.D. 600, 139 N.W.2d 232. We realize that in many jurisdictions criminal punishment is subject to revision on appeal. 24B C.J.S. Criminal Law § 1946. That is not our rule. Apparently such power generally, if not always, derives from constitutional or statutory enactments. ABA Minimum Standards for

Criminal Justice—Appellate Review of Sentences, (Approved Draft 1968) Commentary (a) following § 1.1.

█ █ Defendant asserts that she should have been represented by a lawyer who was not at the same time representing Goode. The mere fact that she and Goode were represented by the same lawyer, does not of itself, establish a conflict of interest depriving her of effective assistance of counsel. Watkins v. Wilson, 9 Cir., 408 F.2d 351; Curry v. State, 36 Wis.2d 225, 152 N.W.2d 906; Davenport v. State, 7 Md.App. 89, 253 A.2d 768. She has not attempted to show any conflict of interest which prevented appointed counsel from impartially and adequately representing her. In fact, Goode's testimony as a witness on her behalf supported her claim of innocence and tended to cast the responsibility upon himself.

Accordingly, the judgment and sentence are affirmed.

All the Judges concur.