STATE, Respondent v. KINGSTON, Appellant

(174 N.W.2d 636)

(File No. 10578. Opinion filed February 10, 1970)

**James H. Wilson,** Rapid City, for defendant-appellant.

**Gordon Mydland,** Atty. Gen., **Walter W. Andre,** Asst. Atty. Gen., Pierre, for plaintiff-respondent.

RENTTO, Judge.

By information 4171 the defendant was charged with the murder of Robin Rich, a female under the age of 15, perpetrated while he was engaged in the commission of the crime of indecent molestation of a minor—a felony under our law. Information 4172 charged him with kidnapping George Snow. Count 1 of information 4173 charged him with robbery from the person of Brenda Paine and count 2 with kidnapping her. All of these acts were alleged to have been committed on July 23, 1967.

Because of indigency his present counsel was appointed to represent him. To each charge defendant entered pleas of not guilty and not guilty by reason of insanity. On his motion they were consolidated for trial, over the objection of the state. By its verdicts the jury found defendant not guilty by reason of insanity of the murder of Robin Rich and the kidnapping of George Snow, and guilty of robbery from Brenda Paine and kidnapping her. On the kidnapping charge he was sentenced to imprisonment for life and on the robbery charge to 20 years imprisonment to run concurrently with his life sentence. He appeals.

While the sufficiency of the evidence is not questioned we think it helpful to briefly detail some background facts. Defendant is a married man about 21 years of age, but at the time in question was not living with his wife. He had been spending some of his time at the Rich home in the Sioux Addition to Rapid City, South Dakota. About 5 or 5:30 on the morning of Sunday, July 23rd, he was observed entering it. At that time there were no adults in the home. Their two young sons, four and three years old respectively, and infant daughter Robin, about 18 months of age, were there in the care of two youthful baby-sitters. Some ten minutes after the defendant appeared at the home the baby-sitters left. About 8 o'clock that morning defendant was seen walking away from the home carrying a long firearm. Within an hour after this Mrs. Rich returned to her home and discovered that her daughter was dead.

The defendant was next seen when he appeared at the apartment of George Snow in Rapid City around 8 o'clock that

morning carrying a shotgun. He demanded that Snow drive him to several places in the city. This Snow did. Apparently defendant was looking for his wife. Being unable to find her he ordered Snow to proceed to Skyline Drive and nearby Dinosaur Park. After the two of them were there awhile, during which he took $16 from Snow, he made him enter the trunk of his car. Defendant then closed the lid and secured it with a rope. This occurred a little after 9 o'clock that morning.

Nearby was parked the pickup camper of Mark Paine of Kirkland, Washington, who was touring the area with his wife Brenda and their three young children. They had observed defendant's activities after he and Snow arrived in that area. After securing Snow in the trunk of the car defendant, carrying his gun, knocked on the door of the Paine camper and requested help in getting the Snow car started. Reluctantly, Mr. Paine came out of the camper and talked with the defendant. He demanded money stating that his gun was loaded. Paine apparently did not have any on his person so, at his request, his wife opened the door of the camper and gave the defendant $10. He then indicated a need for transportation and demanded that the pickup camper be given to him.

After the other members of the Paine family came out of their camper the defendant lined them up facing him. During this time he listened for motor vehicles approaching on the nearby road, lowering his gun somewhat whenever one approached, and demanded that Mrs. Paine go with him in the pickup as his hostage. He declined Mr. Paine's offer to be his hostage with the remark that he might cause him trouble. Threatening her with his gun he forced Mrs. Paine to the truck and ordered her to drive it. When he became convinced that she had never driven a motor vehicle he leaned his gun against the truck and forced her on to the righthand side of the truck seat threatening her with a knife, after which he entered the driver's side with the gun. As he drove away he announced that he would release her at a nearby beer garden. Mr. Paine then released Snow from the trunk of his car and they notified local authorities.

Defendant was soon discovered and in the pursuit that followed he left the main highway and went off on a county road near the Strato Bowl. He had to stop for a gate which Mrs. Paine opened. The nearness of the pursuing officer permitted her to escape to the officer's car. Defendant continued on for a short distance until the truck crashed into some trees. As defendant fled into a wooded region about six miles south of Rapid City, in the area of the Sheridan Lake road, one of the pursuing officers shot him inflicting a slight flesh wound about midsection of his left side. After wandering through the timber for a short time, still in possession of his gun, he surrendered to a resident of the area who detained him until the officers arrived. He was taken to the hospital in Rapid City where his wound was treated at about 10:30 that morning and placed under arrest. A short time after that he was lodged in the county jail.

In view of the fact that the offenses all occurred within a short space of time, at first blush it might seem rather inconsistent that the jury would find defendant not guilty of the first two by reason of insanity and guilty of the other two. However, he makes no point of this. Under the evidence of the expert witnesses the jury was warranted in finding that his mental incapacity to commit crime existed only during the commission of the first two offenses.

Prior to trial defendant filed an application for change of venue claiming that he could not obtain an impartial trial in Pennington County, or anywhere in the state of South Dakota west of the Missouri River. He based his claim in large measure upon extensive pretrial publicity given the case by news media of the area. In connection with this he also pointed out that at about the time of the offenses charged, several other homicides and serious crimes of violence had occurred in the county, which had been similarly publicized. In one of these the father of Robin Rich was convicted of second degree manslaughter in the shooting death of the mother of Robin which took place later on the same day that she was found dead. He asserted that these latter matters had created in the area an atmosphere of excitement, fear, hostility and partiality among its residents.

It is clear from the exhibits filed in support of his motion that the case had been rather extensively publicized in the principal daily newspaper in the area and by the local TV and radio stations. This appears to have been factual reporting of the incidents and the proceedings had in bringing the matter to trial. The reporting of the other criminal matters was in the same vein. That this publicity was factual does not seem to be questioned. Counsel's complaint concerning it was that a fair and impartial jury could not be obtained "because of the public frequent in depth exposure to the facts and circumstances of this case, the frequent relation of this case to the Arley Rich case," and the other recent homicides and crimes of violence in the area.

In denying the motion the trial judge made this statement of his reasons for so ruling:

> "I have concluded, on the basis of the present showing, that the reporting alluded to in the exhibits and shown by the exhibits to have been done concerning this case, although of a rather frequent nature, do not reveal any type of reporting designed to excite and prejudice the people of the county concerning the offense. By that I mean: I don't detect that there has been any editorial opinion type stand taken in any of the reporting. It has been factual. And, of course, as in cases of this nature, the initial reports are somewhat in detail as to the events occurring at that time. I am really not satisfied, on the basis of the present showing, that I can conclude, as a fact, that the defendant cannot have a fair and impartial trial in this county. And, of course, I have taken into consideration the fact of the population of the county being somewhere in excess, or in the neighborhood, at least, of sixty thousand people or more, and the community of Rapid City being a community of some forty-five thousand."

In announcing his ruling he said that if any problem arose in impaneling a jury, or it becomes obvious that there is some un-

derlying prejudice in the community concerning the case or the defendant, he would then reconsider the matter.

In securing the jury 69 persons were examined. Fifteen of these were excused because they indicated that from what they had heard or read of the case they feared they could not be fair. Ten were excused because they felt they would be prejudiced since they had young children in their families. Seven were excused for other causes not related to the facts of or the publicity given this and the other cases. Three were excused because of objections to the death penalty. The defendant exercised 20 peremptories and the state two.

In securing two alternate jurors eight persons were examined of whom only one was excused because of possible unfairness and two on account of opposition to the death penalty. The state exercised two peremptory challenges and the defendant only one. The jury selection process consumed just a little more than one day. All of defendant's challenges for cause urged in the selection of the jurors, including the alternates, were allowed without resistance. At this juncture defendant's motion for a change of venue was renewed. In denying it the judge remarked that a fair jury had been selected and no undue difficulty encountered in the process.

■ ■ Whether the place of trial of a criminal action prosecuted on an information in circuit court should be changed is by statute committed to the court's discretion. SDCL 23-28-7. State v. Hall, 16 S.D. 6, 91 N.W. 325, 65 L.R.A. 151; State v. Belt, 79 S.D. 324, 111 N.W.2d 588; and State v. Austin, 84 S.D. 405, 172 N.W.2d 284. This usually presents a question not always free from doubt and difficulty. State v. McNabb, 60 S.D. 431, 244 N.W. 651. However, we may not disturb the trial court's ruling unless convinced that such discretion has been abused. State v. Husman, 66 S.D. 530, 287 N.W. 30. We are not so convinced in this case.

While the case was given much publicity the examination of the prospective jurors revealed that a surprising proportion

of them had not read or heard of the case and of those who had, only a small percentage felt that they had formed an opinion as to its merits. Nothing in the record indicates that he did not receive a fair trial or that he was prejudiced by the denial of his motion. State v. Meservey, 53 S.D. 60, 220 N.W. 139. It would unduly burden this opinion to review in detail the nature of the pretrial publicity. The trial court's characterization of it in denying the motion is an apt statement.

In Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, cited by defendant in support of his motion, pretrial publicity alone was not the basis of the court's conclusion that the defendant had been denied due process. On the contrary the decision recognizes the need for responsible publicity in effective judicial administration, especially in the criminal field. The court makes clear that the pernicious factor compelling its holding in that case was the setting in which the trial was had which it chose to denominate a "carnival atmosphere". That is not this case.

Nor is it here claimed as was true in the Sheppard case that the publicity concerned matters which were never heard from the witness stand. We are satisfied that this accused received a trial by an impartial jury free from outside influences. The public excitement, inflamed passion and prejudice which made necessary a change of venue in State v. Perkins, 36 S.D. 579, 156 N.W. 73, is not here present.

It is next claimed that under SDCL 23-43-28(1) and (2) defendant was entitled to 20 peremptory challenges on the Robin Rich murder charge, 20 on the George Snow kidnapping charge, 20 on the Brenda Paine kidnapping charge and 10 on the charge of robbery from her, a claimed total of 70. He was permitted to challenge only 20 and urges this as error. Subsequent to the trial of this case we decided State v. Nelson, 84 S.D. 218, 169 N.W.2d 533, in which we said that the fact an information contained several counts, joinable therein, charging separate and distinct offenses does not entitle the accused to any additional peremptory challenges; and that the same rule

applies where several, informations against the same defendant are consolidated for trial. In limiting the defendant to 20 challenges the court gave effect to this rule.

■ On conviction of the offense of murder of Robin Rich, the accused could have been sentenced to death if unanimously recommended by the jury in a supplementary verdict submitted to it after returning its verdict finding him guilty of the murder. SDCL 22-16-12 and 22-16-13. By SDCL 23-43-32(10) a challenge for implied bias may be taken:

> "If the offense charged be punishable with death the entertaining of such conscientious opinions as would preclude his finding the defendant guilty, in which case he shall neither be permitted nor compelled to serve as a juror."

In examining the prospective jurors the state was permitted to inquire of them if they had conscientious objections to the death penalty. As previously indicated three were excused on this ground in the selection of the jury and two in the selection of the alternate jurors.

Defendant complains that this manner of examination did not conform to the statute which limited the inquiry to whether the prospective juror's opinion would preclude his finding the defendant guilty. This is a correct observation. He argues that permitting the state to remove prospective jurors in this manner resulted in a jury organized to convict. We do not agree. In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, the same contention was made. Concerning it the court said:

> "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."

That decision does hold that a sentence of death cannot be carried out if the jury that recommended it was chosen by exclud-

ing veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. In view of the sentences here imposed that problem is not presented.

 While defendant was being held in jail awaiting trial, letters that he wrote and asked to be mailed, were censored by the jail authorities. One to a brother in the service was exhibited by the sheriff to the psychiatrist who had been summoned to testify as a state witness. It does not appear whether this letter was later sent on to the addressee. Another to a newsman was not mailed, but was handed to him by the sheriff. Two letters to his attorney were read by the officers before being mailed. Claiming that the censoring of the latter two was an infringement of a constitutional right to consult with his counsel he asked that the proceedings be abated. This was denied.

As authorized by SDCL 24-11-23 the Board of Charities and Corrections has adopted jail rules and regulations permitting the censoring of mail of inmates. This the authorities may properly do. 72 C.J.S. Prisons § 18c. It is primarily an administrative function. In Cox v. Crouse, 4 Cir., 376 F.2d 824, certiorari denied 389 U.S. 865, 88 S.Ct. 128, 19 L.Ed.2d 136, it was held that the censoring of a state prisoner's letters to his attorney is allowed by established law and that prejudice cannot be inferred from the act of censoring. Here he merely asserts prejudice without any showing that by reason thereof he was prevented effective representation. The contents of the letters would not support such a claim. In our view the court's ruling was correct.

 Apparently Deputy Sheriff George Tennyson, a witness for the state, had interviewed George Snow before trial about the route traveled by him and the defendant after his kidnapping. A question asked him on cross-examination about this was objected to as being improper cross-examination because it was beyond the scope of the direct examination. To his objection the state's attorney added this unnecessary statement: "If Mr. Wilson wishes to call Mr. Tennyson as his own witness,

he may do so, and if he wishes to call the defendant, he may do so, to establish these locations." Claiming that this violated his constitutional right against self-incrimination defendant, out of the hearing of the jury, moved for a mistrial. See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, rehearing denied 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730, and State v. Wolfe, 64 S.D. 178, 266 N.W. 116, 104 A.L.R. 464. His motion was denied.

The state's attorney seems to have promptly realized that his statement was improper. In resisting the motion he explained that it was a slip on his part and not intended. On appeal the attorney general does not attempt to justify it, but urges that it was harmless error. See SDCL 23-1-2. We share that view. Later in the trial defendant became a witness in support of his pleas of not guilty.

In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, which involved comment concerning the defendant's failure to testify, the court declined to hold that all federal constitutional errors regardless of the facts and circumstances, must always be deemed harmful. It laid down the rule that before a federal constitutional error can be held harmless the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt. We are here so persuaded that this error was harmless. It would be unreasonable to say that this single inadvertent statement in the circumstances of this case placed him in a position where he had to testify to avoid any adverse inference from a failure to be a witness in his own behalf. 21 Am.Jur.2d, Criminal Law, § 356.

His remaining contention finds fault with our right and wrong rule of determining criminal responsibility. He suggests that we abandon it and adopt in its place the Durham rule articulated in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, or the rule formulated by the American Law Institute appearing as § 4.01 Model Penal Code. In State v. Waugh, 80 S.D. 503, 127 N.W.2d 429, we were extended a similar invitation which we declined because our rule is one

of statutory origin. SDCL 22-3-1(4). See also State v. Leehman, 2 S.D. 171, 49 N.W. 3; State v. Violett, 79 S.D. 292, 111 N.W.2d 598, and State ex rel. Barnes v. Behan, 80 S.D. 370, 124 N.W.2d 179. Because it was a matter of legislative enactment we stated in the Waugh case that any change in the rule should come from the legislature. That remains our view. We are not aware of any real effort having ever been made to change it, even though it has been our rule since territorial days.

Affirmed.

All the Judges concur.