**STATE of South Dakota, Plaintiff and Respondent,**

v.

**Frank MILLER, Defendant and Appellant.**

No. 11684.

Supreme Court of South Dakota.

Argued Sept. 8, 1976.
Decided Dec. 16, 1976.

---

degree manslaughter. Trial was had by jury commencing January 27, 1975, with the jury returning its verdict on January 30, 1975. On appeal, defendant seeks a new trial. He alleges that the trial court erred in three respects: (1) in refusing to give defendant's requested instruction 8 which adopted the ALI Model Penal Code definition of mental illness and in giving court's instructions 26 and 27 which defined mental illness under the M'Naghten right-wrong test; (2) in giving court's instructions 8 and 12 which contained the word "murder;" and (3) in admitting into evidence certain color slides of the deceased boy, Exhibits 7N, 7O, 7P, 7Q, and 7R, and in providing the jury with a projector during its deliberations to view slides in evidence. We affirm.

On the evening of May 11, 1974, the Sioux Falls Ambulance Service received a call to proceed to a private residence in that city. Upon arriving, the attendants were directed by the defendant to the attic portion of the house which was partially finished into a bedroom. In that bedroom they observed a quilt covering the body of a nude, six-year-old male child, subsequently identified as Chad Lewis. Two officers from the Sioux Falls Police Department arrived shortly thereafter. Pursuant to statements made by the defendant to one of the ambulance attendants, the officers had a conversation with the defendant. After this conversation, the defendant was placed under arrest and subsequently charged with manslaughter in the first degree.

On the afternoon of that day, the defendant was left in charge of four children by his wife as she went to work. The victim and two girls were children born to the defendant's wife before she knew defendant. There was also a baby girl born to the defendant and his wife. Evidently the boy had been given some rabbits whose care was his responsibility. On this day the defendant asked him to feed them. The boy went outside, but neglected to feed the rabbits. When asked about it by the defendant, the boy lied. When the boy had still not fed them forty-five minutes later,

John P. Guhin, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

Laird Rasmussen, of Dana, Golden, Moore & Rasmussen, Sioux Falls, for defendant and appellant.

DUNN, Chief Justice.

Defendant appeals from his conviction in the Second Judicial Circuit Court of first

the defendant ordered him to go the basement of the house. The defendant later went down and attempted to explain the necessity of taking care of the rabbits. Feeling he was not getting through to the boy, he went to find a belt. He could not find one and, upon returning to the basement, he found the boy moving around. The defendant believed the boy was trying to hide from him. The defendant grabbed a two or three-foot hose, ⅜ to ½″ in diameter. According to the defendant, at this point he "went blank." The beating inflicted resulted in multiple contusions, abrasions and lacerations.

The boy apparently went up the stairs under his own power. The defendant checked the boy for injuries and "cleaned the blood off." He then told the boy to take a bath. The defendant again inspected the boy for injuries and sent him upstairs to get clean underwear. Upstairs the defendant saw the boy standing in front of a dresser in the boy's room and tossed him his pajamas. The defendant went downstairs. About an hour later, the defendant went upstairs to check on the boy and found him lying on his back on the floor.

Both the defendant and the boy's mother testified that they had discipline problems with the boy, usually because he had lied. The defendant had disciplined the boy with a belt on previous occasions. As the boy grew older, beatings were less frequent but more severe. The defendant had bruised the boy and had broken his skin before.

Two psychiatrists testified at the trial. One was appointed on behalf of the defendant; one was a state witness. The state's witness testified that he believed the defendant "did understand the difference between right and wrong; that he did know the nature of his acts and behavior at that time." The witness for the defendant testified that the defendant "[s]hows symptoms of unstable behavior patterns * *." He stated that knowing the difference between right and wrong was one factor in the definition of mental illness, but that he more fully defined mental illness as "deviation from what the acceptable form for the community or the area in which the individual lives."

The M'Naghten test of criminal responsibility which was given by the trial court defined mental illness as:

"a diseased or deranged or abnormal condition of the mind which renders a person incapable of knowing or understanding the nature and quality of his alleged wrongful act, or renders him incapable of distinguishing right from wrong in relation to that act."

The defendant's requested instruction defined mental illness according to the ALI Model Penal Code § 4.01 as follows:

"The defendant is mentally ill within the meaning of these instructions if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"As used in this instruction, the terms 'mental disease or defect' do not include any abnormality manifested ownly (sic) by repeated criminal or otherwise antisocial conduct."

■ Defendant contends that because an instruction similar to the court's was rejected by the Eighth Circuit Court of Appeals in *United States v. Frazier*, 1972, 458 F.2d 911, the Fourteenth Amendment requires that this court provide equal protection for those prosecuted in our state courts by adopting the ALI definition. However, the Eighth Circuit's adoption of the ALI definition is not binding on us. The United States Supreme Court has long recognized the power of a state to deal with crime within its borders, *Leeper v. Texas*, 1891, 139 U.S. 462, 11 S.Ct. 577, 35 L.Ed. 225, and that the Fourteenth Amendment

"leaves the states free to enforce their criminal laws under such statutory provisions and common law doctrines as they deem appropriate * * *." *Buchalter v. People of State of New York*, 1943, 319 U.S. 427, 429–430, 63 S.Ct. 1129, 1131, 87 L.Ed. 1492, 1495.

Our legislature in SDCL 22–3–1(4) excepts the mentally ill from those capable of committing crimes in the following words:

"All persons are capable of committing crimes except * * * [l]unatics, mentally ill persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness * * *."

■ This court has repeatedly recognized this statutory test of criminal responsibility. *State v. Kingston*, 1970, 84 S.D. 578, 174 N.W.2d 636; *State v. Waugh*, 1964, 80 S.D. 503, 127 N.W.2d 429; *State ex rel. Barnes v. Behan*, 1963, 80 S.D. 370, 124 N.W.2d 179; *State v. Violett*, 1961, 79 S.D. 292, 111 N.W.2d 598; *State v. Leehman*, 1891, 2 S.D. 171, 49 N.W. 3. We have also stated that any changes in this test should be legislative. *State v. Kingston*, supra; *State v. Waugh*, supra. Defendant urges that we adopt a different definition of mental illness within SDCL 22–3–1(4). We have been requested to do so in the past and have declined. *State v. Kiehn*, 1972, 86 S.D. 549, 199 N.W.2d 594. We find no reason to do so now, even though § 1–1(16), Ch. 158, S.L.1976, effective April 1, 1977, adopts a different definition for mental illness. Until this change goes into effect, we are bound by the present law.

■ Defendant also asserts that the presence of the word "murder" in the court's instructions 8 and 12 [1] implies to the jury that he could have been charged with murder, but that he received favorable treatment by being charged with a lesser offense. He claims such inclusion was superfluous and could only incite the passions of the jury. We disagree. Here the word "murder" was included to explain and differentiate the different kinds of homicide. The thirty pages of instructions clearly indicated that the defendant was not charged with murder and explained the elements of manslaughter by distinguishing that charge from one of murder. Viewed as a whole, *State v. Watkins*, 1971, 85 S.D. 573, 187 N.W.2d 265, the value of these instructions in clarifying the situation clearly outweighed any prejudice. *People v. La Verne*, 1957, 148 Cal.App.2d 605, 307 P.2d 31. [2]

■ Defendant further maintains that admission of color slides of the body of the deceased boy, where black and white photographs were available, was cumulative, repetitious, and inflammatory, tending to incite the passions of the jury. In reviewing the transcript, the trial court evidently felt the slides did portray something not present in any of the photographs. The trial court exercised extreme caution during the trial, limiting the exhibition of the slides to "two

1. Instruction 8.

"A homicide, that is, the killing of one human being by another, may be manslaughter in the first degree, which constitutes a lower degree of homicide and is a lesser offense than the crime of murder.

"Homicide is manslaughter in the first degree when perpetrated without a design to effect death and in a heat of passion by means of a dangerous weapon."

Instruction 12.

"The term 'heat of passion' as used in these instructions, which reduces a killing from murder to manslaughter in the first degree, means such sudden passion as was the result of sufficient provocation which was induced by the act of the person slain as amounts to temporary obscurement of reason, and renders a person incapable of forming a premeditated design to kill and which passion continues to exist until the commission of the homicidal act. The heat of passion which will reduce what would otherwise be murder to manslaughter in the first degree is such mental disturbance or condition as would so overcome and dominate or suspend the exercise of the judgment of the defendant as to render his mind for the time being deaf to the voice of reason, make him incapable of forming and executing the distinct intent to take human life essential to murder, and to cause him, uncontrollably, to act from impending force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition. The sufficient provocation must be such as would naturally and reasonably arouse the passion of an ordinary man beyond his power of control."

2. The instructions on manslaughter are awkward, but they simply follow the statutes where the legislature chose to describe the crime by a process of elimination.

or three to four seconds" per slide. This court has held that it is within the discretion of the trial court to show the body of the deceased by the use of color photographs, *State v. Aschmeller*, 1973, 87 S.D. 367, 209 N.W.2d 369; *State v. Zemina*, 1973, 87 S.D. 291, 206 N.W.2d 819; 8 x 10″ enlargements of color photographs, *State v. Austin*, 1969, 84 S.D. 405, 172 N.W.2d 284; X rays and color slides, *State v. Zobel*, 1965, 81 S.D. 260, 134 N.W.2d 101; and color slides in the course of an autopsy, *State v. Hamm*, 1975, S.D., 234 N.W.2d 60. The trial court found that the slides had evidentiary value on the overall issue of the extreme punishment doled out to this child. We find no abuse of discretion in admitting the slides here, even though, as defendant argues, the actual blow causing the child's death was not visible in the slides because it was hidden by his hair.

> "Photographs, slides and X-rays are admissible when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions and relevant to some material issue. They are not rendered inadmissible merely because they vividly bring to jurors details of a crime or incidentally tend to arouse passion and prejudice." *State v. Zobel*, supra, 81 S.D. at 279, 134 N.W.2d at 111.

■ Finally, defendant asserts that it was prejudicial to allow the jury, upon its request, to have a projector in the jury room to show these slides. It should be noted that once the slides are properly in evidence this mechanical means of properly showing the pictures from the slides would not seem improper or prejudicial. Either the slides should not have been admitted in the first instance or else the jury should not be foreclosed from viewing them. Defendant contends, however, that the limiting of prejudice by the restricted time allowed during trial for viewing the slides was lost by the unregulated examination of the jury; and that it permitted the jury to view the evidence in toto and comment among themselves during the examination. These claims are speculative as we have no way of knowing what took place in the jury room. In *State v. Zobel*, supra, we held that a court, in its sound discretion, could permit a viewer to be used by the jury in its deliberations, although such discretion was to be used with caution. We see no reason to retreat from that rule in this case.

Affirmed.

WINANS and COLER, JJ., concur.

WOLLMAN and ZASTROW, JJ., concur specially.

ZASTROW, Justice (concurring specially).

Although I concur in the result reached in the majority opinion, the instruction defining first degree manslaughter should not be viewed as a model for future cases. When the charge is first degree manslaughter, the trial court should fashion its instructions to define first degree manslaughter without reference to murder. The instructions should define what first degree manslaughter is rather than what it is not.

Additionally, the use of a slide projector during jury deliberations is not a recommended method of review of slides admitted as evidence. Any beneficial effect which may be achieved by limiting the screen time during the trial is seriously jeopardized by the unlimited use of the projector by the jurors. A small slide viewer can adequately allow the jurors to individually review the slides during deliberation.

I am authorized to state that Justice WOLLMAN joins in this special concurrence.