STATE, Respondent v. THIBODEAU, Appellant

(233 N.W.2d 326)

(File No. 11455. Opinion filed September 25, 1975)

James E. Doyle, Yankton, for defendant and appellant.

**William J. Janklow,** Atty. Gen., **Frederick R. Moulton,** Asst. Atty. Gen., on the brief, **Galin Vaa,** Asst. Atty. Gen., Pierre, for the State, plaintiff and respondent.

WOLLMAN, Justice.

Defendant was charged with the murder of his wife, Donna Thibodeau. He pleaded not guilty and not guilty by reason of mental illness. He was found guilty of the charge by a jury, and was sentenced by the court to life imprisonment in the State Penitentiary. He appeals from the judgment of conviction. We affirm.

Defendant and Donna were married on or about September 1, 1972. This was Donna's second marriage; she had a young daughter from her first marriage. The couple lived together, apparently uneventfully, until June of 1973, when the marital relationship began to break down. In the latter part of June of 1973, Donna visited an attorney and commenced divorce pro-

ceedings against defendant. After being served with the divorce papers in late June, defendant moved out of the family residence in the city of Yankton.

Donna's mother testified that during July of 1973, Donna was afraid that defendant was going to shoot her. On July 15, 1973, defendant followed Donna out to Lewis & Clark Lake near Yankton, where she was having a picnic at the park with two of her brothers and their families, her young stepsister, and an uncle. A sister-in-law testified that after having some words with Donna that the other members of the group could not overhear, "* * * all at once he (defendant) hollered out, you are all going to see Donna's blood all over."

A former co-employee of defendant testified that defendant had attempted to call him on June 30, 1973, from Yankton at approximately 5 or 6 p. m. and asked that the witness return the call upon his return to his home. The witness testified that he returned the call to defendant at Yankton at approximately 8 p. m. and spoke with the defendant. The witness testified that he was familiar with the sound of defendant's voice and that he could identify the voice on the other end of the line as being the defendant's. When the witness was asked for the substance of the telephone conversation, defense counsel objected on the ground of lack of proper foundation. The court overruled the objection and the witness testified:

> "Well, we just had a general conversation at first. I could tell he had been drinking a little bit. His voice was shaky, you know. I could tell he had been drinking. Pretty quick he asked me if I had something that would go bang, it started with a "P". I had no idea what he was talking about. Finally he started spelling it out a letter at a time until I knew he wanted a pistol. * * * he said it wouldn't take him long to use it, he'd have it back in two or three days * * *."

One of Donna's neighbors, who lived two houses away from Donna's residence, testified that shortly before 9 a. m. on July 30, 1973, she went outside her home to talk to her husband. The witness looked over and saw defendant standing on the other side

of Donna's car, which was parked in her driveway. As the witness looked at defendant, defendant ducked down behind the car. Shortly thereafter, the witness again glanced over at the car and again saw defendant ducking down behind the car.

Mary Lou Binder, Donna's 13-year-old stepsister, who had moved in with Donna and her husband at the end of the 1973 school year, testified that she had retired for the night at approximately 1 or 2 a. m. on July 30, 1973, and that Donna had come to bed sometime after that time. When Mary Lou awoke the next morning, she saw Donna lying beside her on the bed, apparently unconscious, with blood coming out of her nose. Defendant was standing by the bed. Mary Lou testified that defendant "* * * told me to get out of the room or else I'd get the same thing." At about this time defendant pulled a pistol from his trousers and pointed it at Mary Lou. She begged defendant not to hurt Donna and then left the room and walked to the other bedroom, where she picked up Donna's 4-year-old daughter. Shortly thereafter, as she was holding her niece in her arms, Mary Lou heard the sound of a gunshot come from Donna's bedroom. She then observed defendant leave the bedroom and walk to the kitchen, where he put on the shoes that he had apparently removed when he entered the house, and then leave the house. Mary Lou returned to her sister's bedroom, where she saw Donna lying unconscious on the bed with blood coming from the area of her left temple. Mary Lou then took her niece and went to neighbors to call the police. She observed that the chain lock on the front door, which had been intact the previous evening, had been broken off from the wall.

As soon as the officers arrived at the home, Donna was taken to a local hospital, where she died later that morning as a result of a gunshot wound in her head. During the autopsy that was performed on the body late that morning, the pathologist observed evidence of powder burns surrounding the wound area on the left temple. He removed metal fragments from the skull and gave them to the attending coroner, also a physician, who put an identifying mark on the fragment that was later identified as a .22 caliber bullet and then turned the fragments over to the police department.

During the investigation that was conducted on the morning of July 30, one of the officers removed the chain lock apparatus from the door and took it to the police department, where it was placed in the evidence vault. The Chief of Police, who was assisting in the investigation, observed that the telephone wires to the house had been cut. Upon searching the area, he discovered a pair of pliers, described as side cutters, lying along the fence line approximately 70 feet from the place where the wires had been cut. He turned the pliers over to two of his fellow officers, who in turn turned them over to the officer in charge of the evidence vault at the police department.

Defendant was taken into custody by the Clay County, South Dakota, sheriff in the early afternoon of July 30, 1973, when an eastbound automobile in which defendant was riding as a hitchhiker was stopped at a roadblock at the intersection of Interstate 29 and Highway 50 approximately 5 miles east of Vermillion, South Dakota.

Defendant's claims of error relate principally to the introduction of certain testimony and of certain exhibits.

■ First, defendant alleges that the court erred in permitting the state's witness to testify concerning the substance of the above quoted telephone conversation which he had with defendant on June 30, 1973. As has been stated above, however, this witness testified that he had returned defendant's call at defendant's earlier request; that he was familiar with the sound of defendant's voice; that he could identify the voice on the other end of the line in Yankton; and that he could tell that defendant had been drinking.

> "When the identity of the party against whom a telephone conversation is sought to be admitted has been established by some evidence, either direct or circumstantial, the conversation may be shown in the same manner, and with like effect, as conversations had between individuals face to face." *People v. Goodman,* 159 Cal.App.2d 54, 62, 323 P.2d 536, 542.

See also *State v. Porter*, 251 S.C. 393, 162 S.E.2d 843; *State v. Peterson*, 2 Wash.App. 464, 469 P.2d 980; 22A C.J.S. Criminal Law § 731; 29 Am.Jur.2d, Evidence, § 383. On the ground stated, then, the trial court did not err in overruling defendant's objection to the testimony regarding the telephone conversation.

■ Defendant claims that the court erred in admitting a diagram of the floor plan of Donna's home over defendant's objection that no proper foundation had been laid for the exhibit and there had been no showing that it was drawn to scale. Mary Lou Binder, the only witness who testified with respect to the exhibit, stated that it fairly and accurately, represented the floor plan of Donna's house and that the notations on the exhibit referred to various items of furniture that were located in the home on July 30, 1973. As we stated in a case that involved a nonscale sketch of a motor vehicle accident scene:

"Such exhibits, even though not accurate in every detail or drawn to scale, can be helpful to the jury in visualizing the testimony of the witness. Their admission is addressed to the discretion of the trial court. 32 C.J.S. Evidence § 730; 20 Am.Jur., Evidence, § 739; Wigmore on Evidence, 3rd Ed., § 790; McCormick on Evidence, p. 386." *State v. Aarhus*, 80 S.D. 569, 573, 128 N.W.2d 881, 883.

Although the person who prepared the sketch did not testify, the unequivocal testimony by Mary Lou Binder, who was certainly familiar with the interior of the home, that the diagram was accurate was sufficient foundation to warrant admitting the exhibit. As in *State v. Aarhus*, supra, we hold that there was no abuse of discretion by the trial court in admitting the exhibit in question.

■ Defendant contends that the court erred in admitting two photographs of Donna's residence taken by an officer on November 24, 1973. The officer testified that he had been one of the investigating officers on the morning of July 30, 1973, and that the scene depicted in the photographs taken on November 24, 1973, conformed precisely to the scene as it existed on July 30 with respect to the structures on the premises shown, the only

difference being that there were no leaves on the trees in the November 1973 pictures. We conclude that the court did not err in admitting these photographs. *State v. Belt,* 79 S.D. 324, 111 N.W.2d 588.

■ Defendant claims that the court erred in admitting the chain lock and two wood screws into evidence over defendant's objection that there was no testimony from any witness other than the officer in charge of the evidence vault that the exhibits had been delivered to him. On appeal, defendant has attempted to broaden the scope of his trial objection by contending that there was no evidence concerning the condition or identification of these exhibits prior to their delivery to the custodial officer. Even on the basis of this broadened objection, we hold that the trial court did not err in admitting these exhibits. One of the investigating officers testified that he had removed the chain lock that had been pulled from the wall at the front door and had taken it to the police department; where it was placed in the evidence vault. With respect to the two wood screws, in response to a question from the state's attorney concerning the chain lock in question, the investigating officer who took possession of the chain lock at the scene testified that: "It (the chain) was still attached to the door and the screws from part of it that would be bolted to the door frame were laying on the floor." Although it is true that there was no direct testimony from this officer that he picked up the wood screws and took them to the custodial officer at the police department, we think that the only rational inference that can be drawn from the totality of his testimony is that he did so. To find otherwise, the trial court, and we, would have to conclude that this officer, who apparently made a careful search of the area, neglected to pick up the wood screws and that somehow different wood screws found their way into the custody of the police department. Although there was no direct testimony that the exhibits in question were in substantially the same condition as when they were delivered to the police department on the morning of July 30, 1973, we think that the trial court was correct in admitting the exhibits. As we said in *State v. Christmas,* 83 S.D. 506, 162 N.W.2d 125, the determination of the question whether physical articles are substantially in the same condition as at the time the crime was committed is for the

trial judge, in the process of which he exercises a judicial discretion. In determining this question:

> "The trial judge must be satisfied in reasonable probability that the article has not been changed in important respects. Permissible changes are such as are not likely to mislead the jury. McCormick on Evidence, page 384. In arriving at his conclusions he must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it. (citations omitted) He may also give weight to the presumption that an article continues in the same condition. 2 Wigmore, Evidence, 3d Ed., § 437(1)." 83 S.D. at 510, 162 N.W.2d at 127.

See also *State v. Kiehn,* 86 S.D. 549, 199 N.W.2d 594; *State v. Aschmeller,* 87 S.D. 367, 209 N.W.2d 369.

■ Defendant contends that the trial court erred in admitting the pliers and the bullet fragments into evidence over his objection that there was lack of proper foundation and lack of chain of evidence. Without going into greater detail regarding the factual situation than has already been set forth above, we conclude that what we have said above concerning the chain lock and wood screws applies to the exhibits in question and that the trial court properly concluded in the exercise of judicial discretion that sufficient foundation and chain of evidence had been demonstrated by the testimony of the various witnesses involved in the investigation to warrant the admission of the exhibits.

■ Finally, defendant contends that the court erred in entering the judgment and sentence for the reason that they are contrary to law and that there is no evidence to justify or support them. Defendant has offered no assertion of fact or proposition of law in support of this allegation of error. From our recitation of the evidence set forth above and our determination that the trial court did not err in admitting the evidence objected to, we conclude that the evidence is sufficient to support the verdict; consequently, defendant's assertion that the judgment and sentence are contrary to the evidence and to the law is without merit.

The conviction is affirmed.

All the Justices concur.