STATE, Respondent v. HAMM, Appellant

(234 N.W.2d 60)

(File No. 11539. Opinion filed October 17, 1975)

**Donn Bennett** and **Dan C. Hanson** of Mueller, Bennett & Hanson, Belle Fourche, for defendant and appellant.

**William J. Janklow**, Atty. Gen., **David O. Carter**, Asst. Atty. Gen., Pierre, **William H. Coacher**, Meade County State's Atty., Sturgis, for plaintiff and respondent.

WINANS, Justice.

Arlon Hamm, a wealthy single Meade County rancher, was found dead on his ranch property on the north side of Bear Butte on the night of August 1, 1973, shortly after he had apparently been shot with two different shotguns. On August 25th his stepmother, Billie Jean Hamm, a/k/a Candy Hamm, was arrested pursuant to a warrant charging her and a John Proctor, a/k/a Charles Kenneth Patterson, a/k/a Kenneth Patterson, with conspiracy to commit murder and with murder. Following the granting of a change of venue a jury trial was held for Mrs. Hamm at Bison in Perkins County, South Dakota, from April 22 to April 27, 1974. From a guilty verdict on both counts the defendant Billie Jean Hamm appeals. Having examined all of her issues on appeal we find them to be without merit and we affirm her conviction on both counts.

Sometime during the week following the murder Richard Meyer, a special agent of the South Dakota Division of Criminal Investigation, and a Mr. Cooper of a federal law enforcement agency went to Custer, South Dakota, to question a James Weaver regarding his contacts with Appellant. Weaver testified

that these two agents persuaded him to go to Mrs. Hamm and "pump" her for information concerning the murder of her stepson, threatening to prosecute him for a firearms violation if he did not cooperate. Weaver complied and it appears that Appellant and John Proctor entertained him for an evening with a full description of the events surrounding the crime and of the murder itself. Weaver related this information to the police and they requested him to return to get one more item of information for them, i. e., the direction in which the victim's body was lying after the shooting. Weaver returned to the Hamm residence and got the information and passed it along to the agents. There is some conflict in the stories he told police he had been given, but all versions implicated both Appellant and Proctor in the affair. After his arrest, police confronted codefendant John Proctor with the information they had received from Weaver and Proctor thereupon confessed and pled guilty. He later testified as a witness for the state at Appellant's trial as did Weaver. It should be pointed out that Weaver had known Appellant for a year or more both in South Dakota and elsewhere and that this relationship had been a stormy one. Shortly before the murder, in fact, Weaver—a heavy drinker and already a veteran of several penal institutions—had had a confrontation at Hamm's with Proctor and had subsequently inflicted about $600 worth of damage on the Hamm residence by "shooting up the house" about 22 times with a .22 rifle.

## FOURTH AMENDMENT

Plaintiff in this case contends that her Fourth Amendment rights were violated when the government employed as an agent (under protest) this James Weaver, a familiar acquaintance, to "pump" her for information concerning her stepson's murder. She argues that the police could not do through an agent what they could not do themselves. Had Weaver been simply a capricious friend who chanced upon the admissions voluntarily offered by Appellant and Proctor and who then of his own volition communicated them to the authorities there would not be a hint of an issue. On the other hand it seems that had police first focused on Appellant and Proctor as prime suspects in their investigation and then gone to interview them at home the

interview would be in the nature of an interrogation and better practice would call for or even demand the recitation of *Miranda* warnings. *Orozco v. Texas*, 1969, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311. But neither is the case. Here we have an acquaintance who was pressured by the police to seek information from suspects. Suspects apparently freely divulged details of the murder and left little doubt about what had transpired before, during and after the event. Mrs. Hamm was in no way compelled to admit Weaver into her home, government agent or not. She was under no constraint to answer his questions or even to tell him the truth. She had no way of knowing what use Weaver would make of her story and the record is devoid of any indication that she tried to keep him from repeating what he had heard. Appellant afforded Weaver hospitality and spontaneously divulged the sordid details of the murder. She could have refused him entrance, but did not. She could have prudently kept her own counsel on the subject of the murder but chose to do otherwise. She could have sworn the visitor to secrecy, but no such attempt is claimed. Weaver's rather lengthy criminal record and his known drinking tendencies alone were sufficient to evoke caution in most ordinary people, yet Appellant and Proctor were imprudent enough to boast of their cold-blooded misdeeds. Whether or not Weaver had been then in the employ of the police we are constrained to believe that Appellant's story might well have found its way into the mainstream in short order. The United States Supreme Court in *Lopez v. United States*, 1963, 373 U.S. 427, 465, 83 S.Ct. 1381, 1402, 10 L.Ed.2d 462, 486, observed philosophically that "[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak."

We are not unaware of the separate opinion of Mr. Justice Douglas in *Hoffa v. United States*, 1966, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374. There he observed that "[t]he formula approved today by the Court in *Hoffa v. United States* * * * makes it possible for the Government to use willy-nilly, son against father, nephew against uncle, friend against friend to undermine the sanctity of the most private and confidential of all conversations. * * * As I have said, a person may take the

risk that a friend will turn on him and report to the police. But that is far different from the Government's 'planting' a friend in a person's entourage so that he can secure incriminating evidence. In the one case, the Government has merely been the willing recipient of information supplied by a fickle friend. In the other, the Government has actively encouraged and participated in a breach of privacy by sending in an undercover agent." (found in *Osborn v. United States,* 385 U.S. 323 at 347, 87 S.Ct. 429, at 442, 17 L.Ed.2d 394) We cannot disagree with his sentiments and we find that the conduct of which Appellant complains comes perilously close to a deprivation of her Fourth Amendment rights. Nevertheless we are convinced that the fact situation with which we are confronted falls within the majority's holdings in *Hoffa* and in *United States v. White,* 1971, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453. In *White,* Mr. Justice White for the Court said:

> "*Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), which was left undisturbed by *Katz* [*Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576], held that however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities. In these circumstances, 'no interest legitimately protected by the Fourth Amendment is involved,' for that amendment affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' [citation omitted] No warrant to 'search and seize' is required in such circumstances, nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused, [citation omitted] or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence." 401 U.S. at p. 749, 91 S.Ct. at p. 1125.

Appellant's claim that her Fourth Amendment rights have been violated, in light of the foregoing, is without merit.

## FIFTH AMENDMENT

The Fifth Amendment of the United States Constitution, made applicable to the States by the Fourteenth Amendment, provides in part that· "No person * * * shall be compelled, in any criminal case, to be a witness against himself." Appellant Candy Hamm contends that her quizzing about the murder at her home by Weaver was somehow a violation of this constitutionally guaranteed right against self-incrimination and that Miranda warnings at least should have been given. We do not agree. We recognize that Miranda warnings are called for when a person is being interrogated "in custody at the station or otherwise·deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 1966, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725. Viewed even in the light most favorable to Appellant the visits with Weaver can in no sense be held to be custodial·interrogation and there is no way possible from the record to conclude that there was compulsion or force applied to either Hamm or Proctor for them to divulge the information they so freely gave forth. This is not a case like *Orozco v. Texas,* supra. There the police entered the home of a suspect at four in the morning and asked him questions concerning a murder that had just occurred. The Supreme Court found that, though the questioning took place at home, Miranda warnings ought to have been given. There, however, the testimony was that the petitioner was in fact under arrest and not free to leave when questioned in his bedroom in the early morning hours. Beyond the fact that both·Orozco and Hamm were questioned in their own homes after a murder in which they were implicated we find little similarity in the two cases. Orozco could easily have been intimidated by the very presence of the officers in his bedroom and he had already lost his freedom to leave his house and travel unhindered. Appellant, on the other hand, was not under arrest and in fact was not arrested for some weeks subsequent and there is no reason for us to suspect that the conversation with informant Weaver could have had even the faintest color of a police interrogation. Appellant had no right to *Miranda* warnings at the time complained of and her Fifth Amendment rights were not violated.

In brief, these were uncoerced noncustodial quizzings and what the Court said of the Hoffa-Partin contacts can be applied to the Hamm-Weaver visits:

> "In the present case no claim has been or could be made that the petitioner's incriminating statements were the product of any sort of coercion, legal or factual. The petitioner's conversations with Partin and in Partin's presence were wholly voluntary. For that reason, if for no other, it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated in this case." *Hoffa, supra,* 385 U.S. at 304, 87 S.Ct. at 414.

## SIXTH AMENDMENT

It has also been argued by Appellant that her Sixth Amendment rights have been violated by the police investigation conducted by Weaver. Even granting, *arguendo,* Weaver was an agent of the police we cannot agree with Appellant. The Sixth Amendment of the United States Constitution provides, *inter alia,* for the right to counsel in criminal prosecution. All of the conduct complained of occurred before any judicial proceedings against Mrs. Hamm had been undertaken. In *Kirby v. Illinois,* 1972, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, Mr. Justice Stewart for the Court, said:

> "[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him. [citations omitted]
>
> This is not to say that a defendant in a criminal case has a constitutional right to counsel only at the trial itself. The *Powell [Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158] case makes clear that the right attaches at the time of arraignment, and the Court has recently held that it exists also at the time of a preliminary hearing. *Coleman v. Alabama, supra* [399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387]. But the point is that,

while members of the Court have differed as to existence of the right to counsel in the contexts of some of the above cases, *all* of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

\* \* \* \* \* \*

The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. \* \* It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." 406 U.S. at pages 688, 689, 690, 92 S.Ct. at page 1882.

We therefore conclude that since the activity in question was antecedent to the judicial criminal proceedings as set out and required in *Kirby*, Appellant's claim is without merit.

## "FRUIT OF POISONOUS TREE"

Defendant Hamm next invokes the "fruit of the poisonous tree" doctrine and asks us to find that the confession of her codefendant John Proctor ought to have been suppressed. She bases her position on the theory that Proctor's confession was prompted by the evidence supplied by Weaver. Had police not confronted Proctor with Weaver's information previously supplied to them, she argues, he would not have confessed nor would he have testified against her at her trial. Since we have found that Weaver's "investigation" for the police not unconstitutional we need say little more on the subject. Defendant's argument is of no consequence because she is unable to establish her major premise. The testimony of Proctor cannot therefore be considered "fruit of a poisonous tree" and thus it was properly admitted at trial.

## WITNESS CHANGED TESTIMONY

It would appear that the story which John Proctor told at trial as the state's witness against his cohort, Mrs. Hamm, was not quite the same as the story Mrs. Hamm's counsel expected

him to tell based on previous information and an interview. It is the contention of Appellant's counsel that the state's attorney was aware that Proctor was going to tell a new version of his murderous escapade at trial and that this would substantially prejudice their client's case. The changes in Proctor's story included the time Appellant and Proctor were allegedly to have left Custer for Sturgis, the type of shot utilized by Proctor in the killing, the type of vehicle decedent was driving, and the position of the body, among other details of the killing.

It is undisputed that Appellant's counsel interviewed Proctor in a Sioux Falls hospital shortly before the trial and that no representative of the state's attorney's office was present. Further, there was no complete transcript made of that interview. The state's attorney argues that it was possible that Appellant's counsel might well have ascertained at that interview the "revised" story Proctor would present at trial. We are unable to conclude that the admission of Proctor's testimony constituted reversible error. The state's attorney was free to disclose to defense counsel an anticipated change in Proctor's testimony but he had no strict obligation to do so. Furthermore, Appellant's counsel had full opportunity to cross-examine Proctor on the stand and to establish the credibility of their own alibi witnesses before the jury. While defense counsel may have reacted to the turn of events with surprise they were certainly not totally disarmed. Furthermore, we do not believe that the recounted changes in Proctor's original version when viewed as pieces of the total mosaic need necessarily have altered the basic story substantially. The major details remained the same. There is a growing tendency toward more cooperative and broader discovery procedures, even absent a court order, and we encourage this on the part of both defendants and prosecutors, but on the facts of this case we are unwilling to say that the state's attorney violated any duty to disclose or that the testimony in question ought to have been disallowed.

## COLOR SLIDES OF MURDER VICTIM

At the trial the prosecution introduced a number of color slides taken of the deceased at the mortuary in Sturgis in the course of the autopsy. Appellant alleges that the admission of

these into evidence was reversible error. In view of our holding in *State v. Aschmeller,* 1973, 87 S.D. 367, 209 N.W.2d 369, which we find applicable here, we are of the opinion that Appellant's claim is devoid of merit. There we said:

> "In a prosecution for murder it appears to be a well-established rule that photographs of the victim duly verified, are, in the discretion of the trial court, admissible in evidence as an aid to the jury even though such photographs may have the additional effect of tending to excite the emotions of the jury, as defendant claims they did in this case."

This was clearly a matter of discretion. We have examined the slides in question and cannot find an abuse of discretion by the lower court. Counsel for Mrs. Hamm argue that the slides illustrated nothing which could not have been equally well described in words or by diagrams. This may be true but this does not consequently outlaw the pictures. In the case of *State v. Tinklenberg,* 1972, 292 Minn. 271, 194 N.W.2d 590, the Minnesota Supreme Court said:

> " '* * * Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice. This is the general rule, and any other would be an anachronism in this day when pictures are a common and recognized medium for the accurate portrayal of objects and events.' " 194 N.W.2d at 591.

We can only add to the words of the Minnesota Supreme Court that the television and other pictorial coverage of events of the past decade or two which have included war and rebellion, famine and earthquake, typhoon and hurricane, assassination and suicide, has certainly created an atmosphere and an attitude, in

the minds of most, far different from that which we might have found forty or fifty or more years ago. We suspect that today's average juror would be far, far less disturbed or prejudiced by the sight of the murdered victim's wounds through the medium of a color slide than would have been a turn-of-the-century juror viewing a black and white photo of the victim's draped remains.

## TESTIMONY OF REBUTTAL WITNESS

 Appellant next contends that the admission of witness Ernie Schutterle's testimony was error. Mr. Schutterle was put on the stand by the state as a rebuttal witness to Appellant's alibi defense. Appellant argues that he was not a rebuttal witness at all but a witness who was a part of the state's case in chief whose testimony served to corroborate the testimony of Proctor. It appears that his name at one time had been endorsed upon the information, but subsequently crossed out. Had the trial taken place several months after it actually did the situation would have been different for in July of 1974 SDSL 23-37-5.1 went into effect. That statute provides that the state's attorney shall file and serve upon the defendant the names and addresses of the witnesses the state proposes to offer in rebuttal of the defendant's alibi defense. However, that law was not in effect and the conduct of Appellant's trial could not consequently have been affected by it one way or the other. Witness Schutterle's testimony that he saw a stocky person in a car parked at the historical marker on the evening of the murder might well corroborate the state's case in chief. We assume that any state's rebuttal witness in any trial would serve that function. We would find it impossible to imagine that the state would ever put on a rebuttal witness whose testimony would impeach its case. While the state might well have put Schutterle on to support the testimony of Proctor it also was free to put him on to rebut the alibi of Appellant. Obviously, if she had been at the historical marker at the time suggested, she could not have been simultaneously in Custer absent a capacity to bilocate. The law of the state is well settled on rebuttal witnesses. In *State v. Butler*, 1946, 71 S.D. 455, 25 N.W.2d 648, we held that no endorsement of the names of rebuttal witnesses is required at all. With the modification brought about by the adoption of SDCL 23-37-5.1

that remains the law of this state today. The trial court committed no reversible error in admitting Schutterle's testimony as a rebuttal witness.

## WILL OF ROBERT HAMM

 Lastly Appellant states that the trial court erred in denying the admission into evidence of the last will and testament of the deceased Robert W. Hamm. Mr. Hamm was the husband of Appellant Billie Jean Hamm and the father of the murdered Arlon Hamm. He died subsequent to the commission of the crime, but before the trial. Appellant wanted to use the document to negate the state's theory of a motive for the felonious acts. It is her contention that this would have shown the state of mind of the testator who had been subpoenaed for the trial but who had died before it commenced. We are given to understand that the will would also show Robert Hamm had a doubt about his wife's guilt or innocence. The trial judge ruled that "whether or not a person has a doubt about someone's guilt or innocence is not admissible in evidence on the part of any living person" and refused the admission apparently because one could not testify in death to what he could not testify in life. It is true that in criminal cases whenever the intent or motive of the accused is important and material a somewhat wider range of evidence is permitted in showing such intent or motive than is allowed in support of other issues. 29 Am.Jur.2d, Evidence, § 363. It is also true, however, that trial judges enjoy a certain amount of discretion in the admission of such evidence. Whatever the Court's reasons for refusing to admit the will might have been we cannot say that its ruling was clearly erroneous.

Our review of all of the questions presented upon appeal has brought us to the conclusion that there was no prejudicial error in the trial and conviction of Billie Jean Hamm on both counts in connection with the murder of her stepson Arlon Hamm and the judgment of the lower court is therefore affirmed.

All the Justices concur.