STATE of South Dakota, Plaintiff
and Respondent,

v.

Mary DISBROW, a/k/a Mary Roggen-
kamp, Defendant and Appellant.

No. 11947.

Supreme Court of South Dakota.

April 27, 1978.

Rehearing Denied June 1, 1978.

Peter H. Lieberman, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

Harold C. Doyle of May, Johnson & Burke, Sioux Falls, for defendant and appellant.

WUEST, Circuit Judge.

Appellant Mary Disbrow was convicted of arson and murder. She was married to Cassius Disbrow in 1973. They lived together about five weeks. By mutual agreement they separated and he moved to Deadwood, South Dakota, where he remained for over a year. As a result of this marriage Casey Disbrow was born on February 26, 1974. Mr. Disbrow returned to Sioux Falls in March of 1975. He never contacted his wife but employed an attorney to commence divorce proceedings. On April 14, 1975, he was hired as a truck driver and on April 24, 1975, he was driving a truck in the state of New Jersey. On his return from that trip he had an accident in Cleveland, Ohio, wherein he lost the eyesight of his left eye and was temporarily blind in his right eye for several months. The divorce from appellant was granted on June 25, 1975, and on July 1, 1975, Mr. Disbrow married her sister.

On April 24, 1975, appellant was living in the downstairs apartment at 1024 South First Avenue, Sioux Falls, South Dakota, with her son, Casey Disbrow. She had rented this apartment on a monthly basis and was behind on the April rent. Another payment was due on May 1st and the landlord was threatening to evict her unless she

paid the rent. Appellant had developed a close relationship with Jean Carnicle, a younger girl whom she had lived with part of the time. Jean had stayed with appellant on the night of April 23, 1975. She got up and went to school at about 7:30 a. m. and returned after 1:30 p. m. She went with appellant who had an appointment with a lawyer to discuss the divorce proceedings commenced by Mr. Disbrow. The lawyer showed them an affidavit which had been filed in the divorce case. This affidavit concerned the fitness of appellant as a mother, and this agitated appellant.[1] After they left the lawyer's office they went to the Sunshine Food Store where they saw a brother of Mr. Disbrow. At the time appellant thought it was her husband. Appellant and Miss Carnicle returned to the apartment and appellant said she was going to call the welfare department to have them come and take Casey. Miss Carnicle was fond of Casey and she became upset with appellant. Appellant then started walking toward the Dew Drop Inn for the purpose of calling the welfare department, and Miss Carnicle took Casey and followed appellant with her automobile. At one point she tried to run over her. After they got to the Dew Drop Inn they played a couple of games of pool and Jean then took appellant and Casey home about 5:00 p. m.

Mrs. Welsh lived across the street from appellant. Sometime after 6:00 p. m. on April 24, 1975, she went outside to check on her children. She smelled smoke. About five minutes later she was asked to call the fire department, which she did. After she called the fire department she went outside where a man broke a window and Mrs. Welsh then saw the fire.

Don Wasmoen lived near Sioux Falls on April 24, 1975. His girlfriend (now wife) met him after work. He proceeded to drive on First Avenue, and approximately two blocks ahead he saw smoke. He drove to that location and was told that there was a baby inside the house. The front door was shut. He went to a window and kicked it out. The smoke and flames were so bad he couldn't enter, so he returned to his vehicle and obtained a small fire extinguisher. He tried to extinguish the fire but it was useless. The fire was two or three feet in height. The curtains were on fire and he pulled one of them out, burning himself slightly. Within three to six minutes the fire engines arrived. He saw the appellant, who was upset. As soon as the fire truck arrived he told the firemen a baby was in the house and directed them toward the corner where he had been trying to get in. The firemen put out the fire. They found the body of Casey Disbrow in a crib in one of the bedrooms. Most of the fire had occurred near the crib and the child was dead. The body was removed to the emergency room of the Sioux Valley Hospital. The next day Dr. Schultz, a pathologist, performed an autopsy on the body of Casey Disbrow. It was his opinion the child had died as a result of the fire. The body was badly burned. Appellant was informed at the hospital the child was dead and she was upset. After the fire the firemen sealed the building by nailing a plastic cover over the door and windows.

Shortly after 7:00 p. m. on April 24, 1975, Max Madsen, a detective with the Sioux Falls Police Department, went to the Sioux Valley Hospital and interviewed appellant, who was not a suspect, regarding the fire. She told him her son was sleeping and she was watching the local television news, that she saw a party walking back and forth outside of her apartment with a gun about fourteen to sixteen inches long in his hand. She said it was neither a rifle nor a handgun. She went to the window to more clearly observe the person and he went east on 19th Street and got into a small green car which was parked next to the alley. That he got into the passenger side and proceeded west on 19th Street, then turned south on First Avenue. She stated she left

---

1. The record suggests a homosexual relationship, although the trial court sustained objections to any specific inquiries by the state of the witness, Jean Carnicle. Miss Carnicle did testify the attorney told them the divorce papers referred to appellant as a "misfit" and "stuff."

the house, locked the door and went around to the back of the house to call the police department. She told him she and Casey were the only persons in the house. She further said she went to the rear of the house to contact a tenant in the upstairs apartment, and the tenant told her smoke was coming out of the house. She said not more than five minutes elapsed from the time she left the house to the time she talked to the upstairs tenant. She told him that earlier in the day she had seen her husband and his sister, Linda, at the Sunshine Food Store. She told Mr. Madsen she thought Mr. Disbrow was responsible for the fire because he hated her and didn't think he was the father of the child.

Immediately after the fire appellant lived with Jean Carnicle. Appellant then went to the state of Washington where her mother lived, and on approximately May 15, 1975, they both returned to Sioux Falls. She never did live in the burned out apartment again, although she called the police department and indicated she wished to return to the apartment to retrieve some items of property that belonged to her.

After the fire the Sioux Falls Police Department made a thorough investigation of the facts and circumstances of this case. This included several trips to the house to observe the condition of the basement, the apartment and its contents. At the trial evidence was received which eliminated the origin of the fire from beneath the building, electrical origin, and tended to establish the fire started on the inside near Casey's crib. Other evidence inferred the fire was sudden and caused by a highly combustible substance. Evidence indicated gasoline used for a lawn mower was accessible near the apartment.

On May 1, 1975, Detective Johnson removed a piece of inlaid carpet (Exhibit 2) from the area near Casey's crib which was sent to the F.B.I. laboratory for analysis. Evidence admitted at the trial tended to establish this carpet contained minute quantities of gasoline.

Evidence was introduced that appellant had acquired an insurance policy upon Ca-

sey several months before the fire. Other evidence established a neighbor's mother drove away from the area alone in a small green car shortly before the fire.

At the trial appellant denied harming her son and starting the fire, and repeated her claim about the man with a gun as originally told to Detective Madsen. She also offered evidence of anonymous threats to her before the fire. We have not related all of the evidence produced at the trial but only as much as is necessary to resolve the issues presented for our determination. Further facts will be discussed as we resolve the issues raised by the Assignment of Errors.

The first assignment of error contends the court should have suppressed certain items seized from the appellant's residence without a search warrant. Prior to trial a motion was made by the appellant to:

" * * * suppress certain items of evidence seized from the defendant's dwelling house during a period from April 24, 1975 through May 1, 1975, and for suppression of any testimony, observations, and photographs taken during said period for the reason said searches were illegal and in violation of defendant's Constitutional rights in that said searches were not made pursuant to a search warrant or by consent of the defendant or the owner of the property."

After a hearing, the motion was denied. The detectives made at least two trips to the apartment after the fire, and on May 1, 1975, Detective Johnson removed a piece of inlaid carpet (Exhibit 2). This piece of carpet was subsequently forwarded by the police department to the F.B.I. laboratory in Washington, D. C., where it was analyzed for combustible materials. At the trial an F.B.I. agent offered testimony indicating the carpet contained minute particles of combustible materials which were gasoline. Objections to the chain of evidence and to the qualifications of the agent were made which will be discussed in a later assignment and in further detail.

Appellant never occupied the premises again. On April 26, 1975, she called Detective Johnson and said she wanted to re-

trieve some clothing, and he told her that to the best of his knowledge there was no adult clothing left in the house and that their investigation was not quite complete. Detective Johnson did examine the scene of the fire early on April 25, 1975, including the inside of the apartment which contained debris. He looked for a threatening note which appellant had told him she had received and was in the apartment. At the trial no objection was made concerning the observations of Detective Johnson on April 25, 1975.

It appears from the record and brief the only item now claimed to be subject to an unlawful seizure is Exhibit 2, which consisted of the piece of inlaid carpet removed on May 1, 1975. It is claimed the seizure was unlawful because consent was not obtained from the owners of the apartment and appellant, and the police did not have a search warrant.

■ It is not necessary for us to determine whether the seizure was illegal as to the owners because appellant has no standing to complain about an illegal search and/or seizure of somebody else's property. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176. The appellant had not paid the rent for April or May; she never occupied the premises after the fire although she called and asked about retrieving some personal property on the 26th of April. She was told there wasn't any adult clothing and the record reflects there really wasn't very much, if any, personal property which was retrievable.

■ The only logical conclusion to be inferred from these facts are that she intended to and did abandon the apartment at least by May 1, 1975, if not before. Since the carpet was inlaid and a part of the premises she had rented, it follows Exhibit 2 was not an illegal search and seizure as to her. Abandoned property is not subject to the protection of the Fourth Amendment. *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668. Nor do we understand there is any claim that the sei-zure of the piece of carpet was the fruit of an illegal search when Detective Johnson examined the apartment early the next morning after the fire. Nevertheless, in view of her complaint and explanation of the fire and the alleged threatening note, it could hardly be argued that the morning after observation of the apartment was a search directed against her. The rule is stated in *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697, 702 (1960):

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was directed,* as distinguished from one who claims prejudice only through the use of *evidence gathered as a consequence of a search or seizure directed at someone else.*" (emphasis supplied) [See also *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176.]

The next assignment of error is a three-pronged attack upon the testimony of Mr. Stephen Allen, the F.B.I. agent who conducted the tests on the carpet. First, appellant claims the state failed to establish a proper chain of possession. Mr. Allen was called out of order because of a conflict in his schedule. Thereupon, defense counsel objected to his testimony because no proper chain of possession had been established and for other reasons. At that point a discussion was held outside the presence of the jury, and the state's attorney implied he would establish the necessary chain of evidence and if he didn't the appellant could move for a mistrial. Apparently, with that assurance the court overruled the objection. Mr. Allen testified he received the items of evidence, including Exhibit 2, the carpet taken from the apartment, affixed an identification tag on the item after its receipt and then performed certain chemical tests on the exhibit. Mr. Allen testified he received the exhibit on May 17, 1975. Mr. Raymond Cuccaro testified he was an identification officer with the Sioux Falls Police Department and in charge of preserving evidence, that Exhibit 2 came into his pos-

session as Identification Officer, and along with other items he personally mailed them to the F.B.I. laboratory in Washington, D. C. That he received them back from Washington, D. C. and that to the best of his knowledge none of the contents of the package were changed or altered in any fashion. On cross-examination Officer Cuccaro testified he received Exhibit 2 from Detective Johnson who testified he (Johnson) had removed the carpet from the apartment on May 1, 1975. When Exhibit 2 was finally offered into evidence, appellant objected on the grounds previously urged. He made no motion to exclude the testimony given relative to the analysis but presumedly preserved his record on the chain of evidence. His objection did not point out the deficiencies, if any, in the chain of possession.[2]

■ We are not commending the foundation laid for the chain of possession as any model for prosecutors. We have stated the rule in *State v. Thibodeau,* S.D., 233 N.W.2d 326, 330:

" * * * [T]he determination of the question whether physical articles are substantially in the same condition as at the time the crime was committed is for the trial judge, in the process of which he exercises a judicial discretion. In determining this question:

'The trial judge must be satisfied in reasonable probability that the article has not been changed in important respects. Permissible changes are such as are not likely to mislead the jury. McCormick on Evidence, page 384. In arriving at his conclusions he must consider the nature of the article, the circumstances surroundings its preservation and custody and the likelihood of intermeddlers tampering with it. (citations omitted) He may also give weight to the presumption that an article continues in the same condition. 2 Wigmore, Evidence, 3rd Ed.,

Sect. 437(1).' [*State v. Christmas*], 83 S.D. [506] at 510, 162 N.W.2d [125] at 127. See also *State v. Kiehn,* 86 S.D. 549, 199 N.W.2d 594; *State v. Aschmeller,* 87 S.D. 367, 209 N.W.2d 369."

Viewed in the light of this rule and the state of the record, we conclude the court did not abuse its discretion in receiving Exhibit 2 into evidence nor the testimony relative to the tests.

The second prong of the attack questions the qualifications of Mr. Allen to give expert testimony. Mr. Allen testified he was employed by the F.B.I. and assigned to the laboratory division as a chemist. That he had a Bachelor of Science Degree in Chemistry from Virginia Polytechnic Institute, Blacksburg, Virginia; he had thirty hours toward a Master of Science and Forensic Science Degree from George Washington University; he had been assigned as an examiner for about ten months for the F.B.I.; he had worked as a technician in a laboratory from September of 1968 to July, 1969; that his Bachelor of Science Degree from Virginia Polytechnic Institute consisted of about two hundred quarter hours of study, with seventy-five in chemistry. While working in the F.B.I. laboratory he had used a gas chromatograph which he had also used extensively in college and on numerous other occasions. He further testified he had done chemical analysis as an agent for the F.B.I. working with accelerants, which consist of gasoline, kerosene, wood alcohol, grain alcohol, and numerous other substances.

■ Before testifying as to the results of the analysis, defense counsel asked Mr. Allen whether he considered himself "an expert in forensic science." The witness replied, "No." The qualification and competency of a witness to speak as an expert is primarily in the discretion of the trial court, and its ruling will be disturbed only

2. We are not implying counsel was in any way derelict. On the contrary, he performed very competently. Counsel was an experienced trial lawyer, familiar with the operation of the Sioux Falls Police Department. Clearly, as a trial tactic he was carefully refraining from possibly antagonizing the jury by frequent and possibly obstructive objections. We have to credit him with knowing the largest police force in South Dakota was sufficiently sophisticated to preserve evidence and mail it to the F.B.I. laboratory.

in the case of a clear abuse of discretion. *State v. Percy*, 80 S.D. 1, 117 N.W.2d 99. There is nothing in the record to establish the witness had to be an expert in forensic science to conduct the tests and make the analysis. He had a degree in chemistry, almost a Masters, and practical experience. In our opinion the court did not abuse its discretion in overruling the objection. The witness' qualifications were a question of law for the court, the weight of his testimony was a matter for the jury to weigh.

■ The last prong of the attack on Mr. Allen's testimony consists of the claim that the gasoline used to form the basis of the chart used to show a known substance (gasoline) was not introduced. Mr. Allen testified that using a gas chromatograph he had prepared a chart of the known substance which he identified as gasoline. He then prepared a chart using materials extracted from Exhibit 2, the carpet, and decided it contained minute quantities of gasoline. He gave the reasons for his opinion without objection. Appellant introduced the two charts into evidence herself. This was trial strategy to discredit the witness' opinion to the jury. In objecting to the opinion, Mr. Jorgensen stated:

> "I would object to the testimony as to what's contained in Exhibit 2 because of this man, all he does is compare two charts. He compares a known chart to an unknown chart and makes a determination. I feel that the charts are the proper items to be in evidence before the jury rather than the man's opinion as to what Exhibit No. 2 contains. I think he can say that we can show the two charts and that he can show that they're the same and the jury can make up their own mind. You can say the one chart is known gasoline and the other chart he ran and the jury can make up their own minds if the two charts are similar."

After further discussion between court and counsel, Mr. Jorgensen stated:

> " * * * [I]f the Court is going to allow him to give an opinion, I think he's going to have to give the basis for his opinion and that being that the two charts were

similar because that's all he's got to go on, is that one chart appears to be the same as another chart. There's not magical arriving at an opinion in this case."

By letting the appellant introduce the charts, the reasons for counsel's objection were eliminated. Here was competent counsel laying the groundwork for a strong argument to the jury as to the credibility of Allen's opinion. There never was any question raised at the trial as to whether Mr. Allen actually used gasoline in the preparation of the known chart. Besides, he testified he did, which is sufficient. There is no merit to this final attack.

■ Assignments Three and Four relate to the admission of certain testimony and a motion for a mistrial to a question propounded by the state's attorney. In summary, it was peripheral testimony regarding which the court may have ruled either way, as none of it was particularly helpful to the state nor harmful to the appellant. A trial judge does not have the luxury of long periods of meditation on rulings on evidence; he must often make rapid decisions. In addition, he has the people before him, feels the atmosphere of the trial, and therefore can probably best determine whether certain peripheral evidence should be admitted. Thus, we leave many rulings of evidence, which are not plainly inadmissible and prejudicial, to the discretion of the trial judge. The rulings in question were discretionary with the trial judge and we will not disturb them on appeal.

■ The court received in evidence a slide depicting a color photograph of the body of Casey Disbrow taken by the Sioux Falls Police Department in the morgue at the Sioux Valley Hospital after the fire. This slide was displayed to the jury and the appellant claims the photograph served no purpose other than to arouse the passions of the jury to her prejudice. This photograph is corroborative of Dr. Schultz's testimony concerning the cause of death and reinforces his opinion that the death was caused by fire. Appellant's version concerning the party with the gun suggests the possibility

that death was caused by means other than fire. The slide has some possible value in determining the cause of death. In *State v. Hamm*, S.D., 234 N.W.2d 60, 66, we said:

"In view of our holding in *State v. Aschmeller*, 1973, 87 S.D. 367, 209 N.W.2d 369, which we find applicable here, we are of the opinion that Appellant's claim is devoid of merit. There we said:

'In a prosecution for murder it appears to be a well-established rule that photographs of the victim duly verified, are, in the discretion of the trial court, admissible in evidence as an aid to the jury even though such photographs may have the additional effect of tending to excite the emotions of the jury, as defendant claims they did in this case.'

This was clearly a matter of discretion. We have examined the slides in question and cannot find an abuse of discretion by the lower court. Counsel for Mrs. Hamm argue that the slides illustrated nothing which could not have been equally well described in words or by diagrams. This may be true but this does not consequently outlaw the pictures. In the case of *State v. Tinklenberg*, 1972, 292 Minn. 271, 194 N.W.2d 590, the Minnesota Supreme Court said:

' * * * Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice. This is the general rule, and any other would be an anachronism in this day when pictures are a common and recognized medium for the accurate portrayal of objects and events.' 194 N.W.2d 591."

Admission of the photograph was proper for another reason. The state contended the fire had been set by igniting gasoline which had been poured on the rug adjacent to the crib. There was evidence that if that were done, a very hot fire would occur within a very short time. That the child's body was so completely charred, as the photograph indicates, is consistent with the state's theory. The photograph was thus relevant to the issue of whether the fire was or was not deliberately set. The trial court did not abuse its discretion in permitting the state to show the slide to the jury.

■ During the trial the "Sioux Falls Sun," a local newspaper, ran a news article on the trial. This article contained statements which were not received in evidence, particularly the following:

"Wasmoen told the Sun later that Mary Disbrow seemed more concerned about a small puppy tied to the front porch than about the baby trapped inside."

Wasmoen had completed testimony in the trial, and this statement was never received in evidence. Based upon this article the appellant moved for a mistrial, which was denied, and she then moved to sequester the jurors, which was also denied. On recessing prior to the appearance of this article in the "Sun," the court gave the usual admonishment to the jury and further stated:

" * * * Again, as in closing yesterday, I said, please do not watch or listen to television or radio news programs about this case and please do not read newspaper articles about this case. Monday morning, 8:30. Thank you."

After the motion for a mistrial was made, the judge brought each juror into the courtroom and had him or her sworn. He asked each one if they had read this newspaper edition. They all answered they had not, except one juror. She testified as follows:

"Question: And your name, please?

Answer: Laurie Wentler.

Question: And you're one of the jurors in this case?

Answer: Yes.

Question: During the weekend, in the Sioux Falls Sun, April 25th issue, there's an article concerning this case. Have you seen this issue of the newspaper? .

Answer: Everything but that page of it. I read the funny section.

Question: Has anyone told you anything at all about the contents of the article?

Answer: No.

Question: Do you know anything at all about the contents from any source?

Answer: I was told that it said we were a youthful jury and that is all I was told.

Question: (By Mr. Jorgensen, Defense Counsel) As I understand it, you didn't read any of the contents of that article?

Answer: No, I did not."

◼ Considering the sworn testimony of the jurors, this article could not in any way have prejudiced them against appellant. What the court said in *State v. Pickering*, 88 S.D. 230, 217 N.W.2d 877, 883, applies:

" * * * [I]t is discretionary with the trial court as to whether or not a jury should be sequestered. The trial court did not abuse that discretion in the present case despite the publicity given the trial. The publicity was not inherently prejudicial or irresponsible and *nowhere in the record is there any indication that the defendant was in fact prejudiced by it.* Moreover, the trial court conscientiously admonished the jury on numerous occasions that they were not to listen to newscasts and that their verdict was to be based only on the evidence presented at the trial. As such, we will not disturb the trial court's ruling on the matter in this appeal." (emphasis supplied)

◼ The last assignment claims the court erred in giving Instruction Number 23, which reads as follows:

"Whenever the degree of homicide is made to depend upon it having been committed under circumstances evidencing a depraved mind or unusual cruelty, or in a cruel manner, the jury may take into consideration the fact that any domestic or confidential relation existed between the accused and the person killed in determining the moral quality of the acts proved."

This instruction is based upon SDCL 22–16–3. It was given in *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101. It is claimed the instruction as given was confusing and without further clarification was prejudicial, particularly since the jury was instructed as to premeditated murder and first degree manslaughter. Appellant speculates that the jury may have thought they were entitled to consider the cruelty of the act proved in determining the issue of premeditation. We do not agree. Premeditation was defined for the jury as follows:

"The term 'premeditated design to effect the death' as used in the foregoing definition of murder means an intention, purpose or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed.

A statute of this State provides that a premeditated design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution. It is further provided that such design to effect death may be inferred from the fact of killing unless the circumstances raise a reasonable doubt whether such design existed. Such an inference is nothing more than a permissible deduction from the evidence and it is for the Jury to determine whether or not such an inference is to be made in view of all of the facts and circumstances shown."

In respect to first degree manslaughter, the jury was instructed:

"A homicide, that is, the killing of one human being by another, may be manslaughter in the first degree, which constitutes a lower degree of homicide and is a lesser offense than the crime of murder. Homicide is manslaughter in the first degree when perpetrated without a design to effect death and in a heat of passion, but in a cruel and unusual manner."

The court explained "cruel and unusual manner" as follows:

"The phrase 'in a cruel and unusual manner' as used in our law defining man-

slaughter in the first degree means that the commission of the homicide must be done with some excess of cruelty or refinement or unusual cruelty under the circumstances sufficiently marked to approach barbarity and to make it especially shocking, and the unusual character of the manner displayed in the killing must stand out as sufficiently unusual and unique or peculiar as to astonish and shock persons of normal sensibilities."

The instructions of the court must be considered in their entirety. Since both premeditation, as it relates to murder, and cruel and unusual manner, as it relates to first degree manslaughter, were defined, the jury could not have confused Instruction 23 with premeditation.

The judgment appealed from is affirmed.

DUNN, C. J., and PORTER, J., concur.

WOLLMAN, J., concurs in result.

ZASTROW, J., dissents.

WUEST, Circuit Judge, sitting for MORGAN, J., disqualified.

ZASTROW, Justice (dissenting).

"It is the duty of the State to present relevant and material facts to the jury to stimulate their mental processes so that they might thereby arrive at the guilt or innocence of the accused. But to introduce evidence only for the purpose of arousing the passions and prejudices of the jury, in such a manner as to cause them to abandon any serious consideration of the facts of the case and give expression only to their emotions, is clearly outside the scope of such duty and a violation of an accused's right to a fair trial.

"It is a part of our American heritage that every defendant, regardless of what he may be accused, and no matter what the public feeling may be against him, is entitled to a fair trial, with the introduction against him only of evidence which is sanctioned by established law." *Kiefer v. State,* 1958, 239 Ind. 103, 153 N.E.2d 899.

The use of photographs of a deceased victim is subject to two tests for admissibili-

ty. First, it must be relevant to prove a material fact at issue in the trial. *State v. Hamm,* 1975, S.D., 234 N.W.2d 60; *State v. Miller,* 1976, S.D., 248 N.W.2d 56; *State v. Zemina,* 1973, 87 S.D. 291, 206 N.W.2d 819; *State v. Aschmeller,* 1973, 87 S.D. 367, 209 N.W.2d 369; *State v. Austin,* 1969, 84 S.D. 405, 172 N.W.2d 284; *State v. Zobel,* 1965, 81 S.D. 260, 134 N.W.2d 101.

The majority finds the photograph of the charred body of the child of *"some possible value"* in determining the cause of death, apparently to disprove death by gunshot. Even if one assumes that a defendant's plea of not guilty places all matters, including cause of death, in issue, I question this photograph's relevance on that issue. This unfortunate victim could well have been shot several times, and an examination of the photograph would not reveal their existence.

Next, the majority finds the photograph *"consistent"* with a very hot fire. I cannot see this photograph as being relevant to show that it was a "very hot fire," a "hot fire," or a "cold fire." The photographs of the room were certainly relevant to show that the burn pattern indicated a deliberately set fire. However, the photograph of the body on the autopsy table taken the next day would certainly not be relevant to proving whether the fire was deliberately set or not.

Accepting, for the sake of discussion, that the photograph was relevant to prove either or both of the issues, there is a second test which must be applied to determine the admissibility of gruesome and inflammatory photographs, i. e., "the probative value [must outweigh] the probable prejudicial effect. Accordingly, photographs should be excluded where their logical relevancy will unquestionably be overwhelmed by the inherently prejudicial nature of the particular picture; and photographs which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if they are entirely irrelevant or not substantially necessary to show material facts or conditions." 23 C.J.S. Criminal Law § 852(1)c; 40 Am.Jur.2d, Homicide, § 419; Annot., 73 A.L.R.2d 769.

There appears to be little question that the slide photograph is gruesome, shocking, and would tend to arouse the passion and prejudice of the jury. The trial court was very aware of the gruesome nature of the slide, since it purposely restricted the jury's viewing of the slide to a "few moments." Then it went even further and would not allow the jury to take this "relevant" exhibit to the jury room. Certainly, if the slide is relevant to show the cause of death or that the fire was deliberately set, it must be viewed longer than a few moments. It certainly was not the intent of this writer in *State v. Miller,* supra, to suggest that any gruesome photograph would be admissible so long as the viewing time was short. One can imagine that the impact upon a juror might be magnified by a short, one-time glimpse of this slide.

Although there are cases which have held the error in admitting gruesome photographs not to have been prejudicial where the evidence of guilt is overwhelming, this does not appear to have been such a case. It was based upon circumstantial evidence and it might have been decided differently. Because I cannot say with any certainty that this photograph would not have been the influencing factor, I would reverse and remand the case for a new trial.